275 Kan. 644 (2003)
68 P.3d 134
STATE OF KANSAS, Appellee,
v.
MARCUS B. WASHINGTON, Appellant.
No. 87,383
Supreme Court of Kansas
Opinion filed May 9, 2003.
*646 Janine Cox, assistant appellate defender, argued the cause, and Steven R. Zinn, deputy appellate defender, was with her on the brief for appellant. Marcus B. Washington, Jr., appellant, was on a supplemental brief pro se.
Jerome A. Gorman, assistant district attorney, argued the cause, and Terra D. Morehead, assistant district attorney, Nick A. Tomasic, district attorney, and Carla J. Stovall, attorney general, were with him on the brief for appellee.
The opinion of the court was delivered by
DAVIS, J.:
Marcus Washington was convicted of first-degree premeditated murder and criminal possession of a firearm based upon the January 16, 2000, shooting death of Stacey Quinn. The defendant was sentenced to 50 years in prison without the possibility of parole (a hard 50 sentence). He contends that numerous errors occurring before, during, and after trial require reversal of his convictions and a new trial. Based upon the record and for reasons set forth in this opinion, we affirm the defendant's convictions, vacate his sentences, and remand for resentencing.
Officer James Bauer of the Kansas City, Kansas Police Department responded to a report of shots fired in the neighborhood of *647 33rd and Farrow at 1:26 a.m. He found a woman later identified as Stacey Quinn, laying on the lawn of Beatrice Cannon's home at 3217 Farrow. Medical personnel summoned to the scene determined that Quinn was dead.
Erik Mitchell, a forensic pathologist, testified that Quinn suffered a number of gunshot injuries, with entry and exit wounds to her neck, chest, torso, and extremities. Dr. Mitchell recovered a bullet from Quinn's clothing and another from the surface of Quinn's neck. He also recovered a bullet from Quinn's liver. Dr. Mitchell opined that Quinn died from the gunshot wounds, which caused internal hemorrhaging and great blood loss.

Neighbors' Trial Testimony
Erica Warrior, who lived next door to where Quinn's body was found, testified that she heard gunshots in the early morning hours, dialed 911, and then heard a young woman cry for help. After the 911 call, Warrior heard another set of gunshots. Contrary to the defendant's testimony, Warrior did not hear tires screeching and did not hear a car speeding away. She also did not hear the victim make a threatening statement.
John Carr also lived next door to the crime scene. At approximately 1:30 a.m., he heard a volley of about 10 shots, which lasted about 5 seconds. The shots sounded to Carr like they came from a handgun. Carr testified he then heard a woman cry for help. According to Carr, he heard the woman say, "Help me, oh help me, please somebody help me." Carr testified that the woman's cry sounded like it came from Cannon's house.
Carr called the authorities, and as he was calling he heard a second volley of shots. Carr believed the second volley also contained 10 shots and lasted about 5 seconds. Carr said that 1 minute lapsed between the first volley of shots and the woman's cry, and less than 1 minute lapsed between the cry and the second volley. He did not hear an automobile collision or screeching tires during this time.
Carr's daughter also testified and generally confirmed her father's testimony. In addition, she testified that she looked out of her bedroom window and viewed a man with a gun run across the *648 front lawn of her house. Carr's daughter identified the defendant to the jury as the man she saw run in front of her house.
Mashan Minor, who resides three houses from the crime scene, testified that the early morning shots woke her up. She opened her front door and saw a young lady hopping in the street on the corner of 33rd and Farrow. Minor observed that a shoe was in the middle of the street. She also heard the victim at Cannon's house knocking on the door and pleading for help. Minor looked out the door again and observed someone standing in Cannon's driveway. Minor shut her door and then heard another round of gunfire.

Investigation of Evidence at the Crime Scene
After calling for medical help, Officer Bauer testified he noticed blood at one location and shell casings at two different locations. Marvin Main, a crime scene technician for the police department, identified and gathered the shell casings at 33rd and Farrow and those found near the body of the victim. He found no firearm at the scene or on the body of the victim. He recovered a bullet from the living room of Cannon's house. Officers also recovered .40 caliber bullets from the scene, in addition to one .25 caliber casing which tended to support the defendant's theory that Quinn shot at him with a small caliber firearm.
Officers found a Chevrolet Cavalier parked on 33rd Street not far from where Quinn's body lay. The vehicle's engine was still warm. The car was locked, but the keys were lying on the back floorboard of the vehicle. The Chevrolet Cavalier was registered to Nina Betts. Detective Zeigler, along with another detective, Roger Golubski, contacted Betts at her apartment between 8:30 and 8:45 that morning. The defendant answered their knock at the door, and Zeigler asked to speak with Betts. Zeigler went outside with Betts and asked about her car. According to Zeigler, Betts said that when her mother had left around 11 the night before, her car was still parked outside. There was no indication, such as broken glass, that the car had been stolen.
Betts told Zeigler that the defendant had been at her apartment the entire evening. Zeigler wanted to get both the defendant and Betts to the detective bureau to see whether their stories matched. *649 Zeigler asked the defendant to go to the detective bureau, and the defendant agreed. Zeigler also asked Betts' permission to search her apartment. She agreed, and officers found a styrofoam container for bullets in the bathroom. They also found a bullet on the floor of a closet in a bedroom and a handgun in the closet which was later identified as the one used against the victim, Stacey Quinn. Betts had denied that any firearms were in her apartment.
Zeigler and his partner, Golubski, took Betts' statement at the detective bureau at around 1:15 p.m., and then took the defendant's statement. At one point during the discussions with the defendant, he began to cry uncontrollably. The detectives concluded that the defendant might implicate himself in the shooting. After settling the defendant down, the detectives advised him of his Miranda rights. He acknowledged these rights and elected to talk to the detectives. He admitted his involvement in the shooting. An audiotape of the defendant's statement was played for the jury, and a transcript from the interview was shown to the jury.
The defendant testified that he was deathly afraid of a man by the name of Hill at the time of the shooting, who, according to the defendant, had made prior attempts on the defendant's life. He believed the victim, Stacey Quinn was involved with Hill in a plot on his life. Because of this fear, the defendant testified he acted in self-defense in shooting Quinn. Consistent with psychiatric testimony on his behalf, the defendant testified that he had not intended to kill Quinn and that he had not possessed the mental state necessary to commit the crime of premeditated murder.
The defendant's ex-wife, Sony Reeves, testified that Hill demonstrated threatening behavior toward the defendant on two occasions and, after each of these incidents, the defendant was very scared. In August or September 1999, she bought the .40 caliber handgun because there had been break-ins at the apartments where she lived. Reeves left the handgun at the house of the defendant's mother when she and the defendant separated in October 1999. On cross-examination, Reeves identified the firearm recovered from Betts' apartment as the one she had purchased.
Betts testified that there was no damage to the Chevrolet Cavalier on the day before the shooting. However, after the shooting, *650 Betts noted that there was a dent behind the driver's side door. Betts also testified that after the shooting, there were approximately five to eight new dents on the passenger door which looked like buckshots.
The defendant testified concerning the first incident between him and Hill which occurred in a parking lot during the summer of 1997. The defendant told the jury that Hill fired shots at him and that he had been afraid of Hill from that time on. The defendant did not report this incident to the police. The second incident occurred in June 1998 while the defendant attended a barbecue. A vehicle pulled up to the house and stopped, and Hill emerged from the vehicle pointing a gun at the defendant. The defendant testified he dove through a screen door to protect himself. The police were called, and they responded to the scene.
The defendant testified that as a result of the two incidents he had been having nightmares in which he was killed as a result of an altercation with Hill. In his dream, the defendant was unable to make it through the screen door. The defendant testified that his fear of being killed existed at the time of the shooting and continued to exist at the time of his testimony at trial.
The defendant also described for the jury his version of the events that led to Quinn's death. He received a call from his mother the night before the shooting. She asked him to pick up his younger brother from a skating rink which closed at 11:30 p.m. The defendant picked up his brother from the skating rink and dropped him off at his mother's house. He then visited a friend for about an hour, leaving around 1 a.m. and drove by his mother's house to make sure that everything was in order there.
After driving past his mother's house, he saw a woman frantically waving her arms along the street in the area of 27th and Brown. The defendant partially rolled down his window to see what the trouble was. The woman, who was later identified as Quinn, asked the defendant whether he had any "yay." The defendant said that he did not sell drugs. Quinn asked for a ride, and the defendant agreed to give her a lift. Quinn asked the defendant to let her visit a house at 3216 Farrow. The defendant turned right off of Farrow onto 33rd Street and waited for Quinn to return to his car. Quinn *651 returned to the defendant's car, and the defendant began to reverse toward Farrow to leave.
At this point, the defendant said that another vehicle heading east on Farrow struck his car while he was in the process of backing onto Farrow. The defendant said that he panicked and drove a short distance forward on 33rd and then stopped.
The defendant said that he believed Hill or Hill's relatives were somehow involved in the collision. The defendant grabbed the .40 caliber firearm and got out of the car. Quinn tried to wrestle the gun away from the defendant, but the defendant managed to get the gun and exit the vehicle. The defendant proceeded to walk down 33rd toward the intersection of 33rd and Farrow. The vehicle that collided with the defendant's vehicle approached the defendant. He pointed his firearm at the car, and the car reversed away from the defendant. The defendant shot at the vehicle. The defendant said that he was fearful.
As he returned to his vehicle in order to call the police, Quinn confronted him pointing a small caliber chrome firearm directly at him from the middle of the street. The defendant described the woman as wild-eyed and shaking. He thought that Quinn was under the influence of something. The defendant testified that Quinn said that she was going to "fuck [him] up." According to the defendant, Quinn fired first and he fired back without stopping until his gun was empty.
The defendant said he went back to his car but the keys that he thought were in the ignition when he left his car were gone. The defendant ran down the street, and a man picked him up and took him home. The defendant told the jury he did not intend to shoot Quinn. When he returned to Betts' apartment, Betts was there, and she was sleeping.
The defendant called Steven Weinberg, an accident reconstructionist, to testify. In Weinberg's opinion, the damage to Betts' car was consistent with the story that his car was parked and that it was impacted by a larger vehicle. Weinberg testified that the damage to the passenger side of the vehicle appeared to be caused by gunshots. Weinberg observed eight distinctive dents. Weinberg opined that a small-caliber firearm, either a.22 or a .25 caliber *652 would have caused the damage to the passenger side of the vehicle. According to Weinberg, the bullets came at an angle from the rear of the car, which was consistent with the defendant's story that he encountered Quinn standing in the middle of Farrow.
The defendant also called Gilbert Parks, a psychiatrist, to testify. Dr. Parks testified he met with the defendant on five different occasions and the defendant talked to Dr. Parks about the two incidents involving Hill. Dr. Parks believed each of the incidents involving Hill were key to understanding the defendant's emotional state. Dr. Parks testified that the incidents between Hill and the defendant were traumas for the defendant. Dr. Parks diagnosed the defendant with having suffered from posttraumatic stress disorder (PTSD) on the day of the shooting. Dr. Parks said that when Quinn pointed a gun at the defendant, it was just another of a string of incidents during which the defendant perceived a threat to his life. It was Dr. Parks' opinion that the defendant did not possess the requisite intent of willfulness when he shot Quinn. Dr. Parks believed that the defendant was not capable of intentionally shooting Quinn that day.
In rebuttal, William Logan, a psychiatrist, criticized Dr. Parks' diagnosis. Dr. Logan reviewed a report written by Dr. Parks and found that it did not list the qualifying symptoms for PTSD. Dr. Logan questioned why Dr. Parks did not interview the people surrounding the defendant to verify the symptoms the defendant described. Dr. Logan said that PTSD did not explain why the defendant would have followed Quinn to Cannon's front steps. Further, Dr. Logan found it questionable that someone suffering from PTSD would pick up a stranger so early in the morning.
To counter Dr. Logan's testimony, the defendant called another psychiatrist, Elizabeth Roberta Hatcher, who testified that after reviewing Dr. Parks' report she did not find anything that would lead her to believe the defendant was not suffering from PTSD.

The Defendant's Claims on Appeal
With the aid of appellate defense counsel, the defendant raises the following claims: (1) Racial bias in the selection of the jury, (2) failure to suppress his confession, (3) exclusion of evidence in support *653 of his trial theory, (4) prosecutorial misconduct, (5) limitation of cross-examination, (6) insufficiency of evidence to support first-degree premeditated murder, (7) refusal of trial court to provide posttrial counsel with a trial transcript resulting in a lack of adequate representation for the defendant in his motion for new trial and in his sentencing, and (8) a violation of Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), in his hard 50 sentence. In addition, the defendant assigns six errors in his pro se brief, most of which are raised above by appellate defense counsel.

(1) Racial bias in the selection of the jury.
The defendant argues the State's use of its peremptory challenges violated his equal protection rights under the Fourteenth Amendment to the United States Constitution, as interpreted in Batson v. Kentucky, 476 U.S. 79, 84-89, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). This court's standard of review is set forth in State v. Vargas, 260 Kan. 791, 794-95, 926 P.2d 223 (1996):
"In reviewing a Batson violation concerning the State's use of a peremptory challenge, the applicable appellate standard of review is whether the trial court abused its discretion in determining if the challenged strikes were constitutionally permissible. State v. Walston, 256 Kan. 372, 373-74, 886 P.2d 349 (1994). Judicial discretion is abused only when exercised in an arbitrary, fanciful, or unreasonable manner, or in other words, when no reasonable person would take the view adopted by the trial court. Walston, 256 Kan. at 374 (citing State v. Wagner, 248 Kan. 240, 242, 807 P.2d 139 [1991]).
"The Batson analysis involves a three-step process. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Batson, 476 U.S. at 96-97. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. 476 U.S. at 97-98. Finally, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination. 476 U.S. at 98."
In State v. Bolton, 274 Kan. 1, 49 P.3d 468 (2002), we said that review of the first step (whether the defendant has made a prima facie showing that the prosecution has used peremptory challenges on the basis of race) is a question of legal sufficiency subject to plenary review. We also confirmed in Bolton that the standard of *654 review for the third step (whether the trial court erred in determining the defendant has failed to carry the burden of establishing purposeful discrimination) was deferential: "A reviewing court gives great deference to findings of the district judge in actions of this nature because the findings turn upon evaluation of the credibility of the prosecutor." 274 Kan. at 10. See State v. Douglas, 274 Kan. 96, 102, 49 P.3d 446 (2002).
The defendant acknowledges the holding of the United States Supreme Court in Purkett v. Elem, 514 U.S. 765, 767-68, 131 L. Ed. 2d 834, 115 S. Ct. 1769 (1995), with reference to Batson's second step:
"The second step of this process does not demand an explanation that is persuasive, or even plausible. `At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' [Citations omitted.]"
The defendant argues that we should interpret the Kansas Constitution as providing more protection to its citizens than United States Constitution provides under Purkett. We rejected this argument in Bolton:
"Bolton presents no argument that would warrant this court to find the Kansas Constitution provides greater protection under this particular circumstance. Thus, the prosecutor is only required to put forth a facially valid reason for exercising a peremptory strike to satisfy the second step of the Batson analysis." 274 Kan. at 17.
Nevertheless, the defendant also argues that his equal protection rights were violated under Batson and Purkett because the State failed to give factually correct reasons for the strikes of venireperson Spratt and venireperson Anderson. This argument is addressed below.
The jury selected to hear the defendant's case was composed of two African-Americans, one Asian-American, one Native American, and eight white jurors. Following the jury selection, the defendant lodged a Batson objection. The defendant noted that of the 12 venirepersons struck by the prosecutor 10 were African-American. As to four of the African-Americans struck, the defendant on appeal concedes that there were legitimate reasons to strike *655 venirepersons Blake, Fielder, and Collins and fails to mention venireperson McDonald. Thus, the defendant abandons any claim of error based upon these persons.
The defendant's arguments concerning the remaining six African-Americans struck by the prosecution fail because he either failed to object to the prosecutor's factual basis for the race-neutral explanations or because the trial court did not err in finding that the State offered a facially valid race-neutral explanation for striking the venirepersons.
On appeal, we accept as true the statements of fact given by the prosecutor for purposes of determining whether the prosecutor gave race-neutral reasons for the strikes if the defendant failed to object to the statements. Bolton, 274 Kan. at 18, see State v. Poole, 252 Kan. 108, 843 P.2d 689 (1992). With the exception of venirepersons Spratt and Powers, the defendant failed to object to the State's statements of fact as to the race-neutral reasons.

Venireperson Spratt
The prosecutor asked venireperson Spratt about her education level because Spratt failed to indicate it on the questionnaire. Spratt said that she graduated high school and junior college. Spratt said that she served on a criminal case 5 to 6 years ago but that she "vaguely" remembered what the prior case was about: "It wasI don't know what you would describe it as. I guess a young man and lady got into an argument at a gas station and it ended up being criminal because she said he took jewelry from her."
In giving a race-neutral reason for striking Spratt from the panel, the prosecutor gave three reasons: (1) Spratt was evasive on what kind of jury trial she had served on, (2) Spratt had a hard time remembering or understanding the concept of what that case was about, and (3) that Spratt "lives in the projects" where there were many homicides. The defendant objected to the reference to the fact that Spratt lived in the projects. The prosecutor reminded the court that there were other reasons for her strike of Spratt.
The defendant argues that "living in the projects" is a proxy for race, citing United States v. Bishop, 959 F.2d 820, 826 (9th Cir. 1992), wherein the court noted that "where residence is utilized as *656 a surrogate for racial stereotypesas for instance, a short hand for insensitivity to violenceits invocation runs afoul of the guaranties of equal protection." The defendant also disputes that Spratt was vague about her prior jury service.
Spratt admitted that she vaguely remembered the facts of the prior case and that she was unsure about how to describe what seemed to be a simple robbery. This alone constitutes a facially valid, race-neutral reason to strike Spratt. Thus, regardless of how one might view the prosecutor's remarks concerning Spratt's residence, the defendant's Batson challenge as to Spratt fails.

Venireperson Hodges
Venireperson Hodges said that she works two jobs, one of which requires her to work from 5 p.m. until 10 p.m. The prosecutor asked Hodges about her education level because Hodges failed to indicate that information on the questionnaire. Hodges said she had a bachelor's degree in business administration and she had previously served as a juror in a criminal trial which involved a nonhomicide shooting about 15 years ago. In giving a race-neutral reason for striking Hodges, the prosecutor said that Hodges was evasive about her prior jury experience and had a difficult time remembering or understanding the concept of what the case was about.
On appeal, the defendant disputes that Hodges was evasive about her prior jury service. The State cites State v. Thomas, 28 Kan. App. 2d 655, 663, 20 P.3d 82 (2001) (racially neutral reason when prosecutor said potential juror gave prosecutor "very funny, weird looks and she wasn't responding very well"). Like the court in Thomas, this court does not have a way of determining Hodges' demeanor. See 28 Kan. App. 2d at 663. The State also points out the detail with which a white potential juror described his prior jury experience, recalling that the case in which he served as a juror was a robbery and murder and remembering that the prosecutor in the case was now the judge presiding over the defendant's trial. We conclude the trial court was correct in its determination that the State established a facially valid race-neutral reason for striking Hodges.

*657 Venireperson Anderson
Venireperson Anderson volunteered that she was a cousin of Greg Hill. The prosecutor asked Anderson the age of her cousin, and she estimated him to be about 18 years old. When told that the Hill involved in the case was about 28 years old, Anderson said that the two Hills could not be the same person. The prosecutor then corrected herself and said that the Hill involved in the case was 25 years old; Anderson's response was equivocal:
"[Prosecutor]: I actually misspoke. Let me go look because I didn't look when I said 28. I was thinking about another case. Let me look real quick.
. . . .
"[Prosecutor]: I checked. He would be 25 now.
"Venireperson Anderson: I really don't know.
"The Court: Okay. You and he are obviously not close and you don't see a lot of him?
"Venireperson Anderson: No."
At this point, the court asked Anderson if it would affect her ability to decide the case if the relevant Hill turned out to be her cousin. Anderson said that it would not affect her.
In giving a race-neutral reason for the strike, the prosecutor cited the potential relationship between Anderson and the Hill involved in the case. The prosecutor admitted that there was some uncertainty, but she did not want to take the chance. This uncertainty establishes a facially valid race-neutral reason for striking Anderson, and the defendant's Batson challenge fails as to Anderson.

Venireperson Bullock
The record indicates venireperson Bullock did not respond to any of the voir dire questions which the prosecutor admitted in explaining her strike. In giving a racially neutral reason for striking Bullock, the prosecutor said that Bullock incorrectly filled out the juror questionnaire. Bullock indicated on the form that she was single but then indicated her spouse's employment. Bullock offered the names of her children and omitted their ages when the form called for the children's ages, not their names. In general, the prosecutor said that Bullock could not follow directions.
*658 On appeal, the defendant argues two other potential jurors also listed the names of their children. See State v. Betts, 272 Kan. 369, 396, 33 P.3d 575 (2001) ("We have held that the fact the State strikes a minority juror but fails to strike a white juror with similar characteristics is circumstantial evidence of purposeful discrimination."). However, both of these potential jurors did not omit the ages. The defendant argues two other potential jurors indicated the gender of the children. However, neither of these potential jurors omitted the ages.
As the defendant failed to establish other potential jurors who omitted requested information from the questionnaire, we conclude, as the trial court, that the State provided a facially valid race-neutral reason for striking Bullock.

Venireperson Brantley
Venireperson Brantley, an artist and publisher, said that a close friend of his had been murdered. Brantley said that he had made time for the jury service and that he had two daughters to take care of, although he said that they would be fine. When asked by the defendant's attorney whether any of the potential jurors had known someone to carry a gun for protection, Brantley responded, "Yes. They hear that someone is after them or they feel there is a reason for them to carry a gun."
In giving a race-neutral reason for striking Brantley, the prosecutor referred to Brantley's sympathy for a person who would be forced to carry a gun for protection. The prosecutor also cited the facts that Brantley was responsible for the care of his children and responsible for his business.
On appeal, the defendant disputes that Brantley knew someone who carried a gun. The defendant also points out that Brantley assured the court that his daughters and business would be fine.
The State gave a facially racial-neutral reason for striking Brantley. Whether Brantley personally knew someone who carried a gun or not, something triggered him to respond to the question and, regardless of what that something was, it indicated sympathy for the need to carry a gun for self-protection. This sympathy, in turn, translated into sympathy for the defendant's theory at trial.

*659 Venireperson Powers
Venireperson Powers said that she was a high school student. The prosecutor cited her lack of life experiences in offering a race-neutral reason. The defendant argued to the trial court that Powers was an eligible voter and had life experiences. While Powers certainly had had life experiences, she likely had fewer than the remainder of the potential jurors. The defendant's challenge to the State's strike of Powers is rejected because the record supports the racially neutral reason that Powers was relatively young and inexperienced.
We conclude from reviewing the record before us that the trial court did not err in determining that the State provided facially valid race-neutral explanations for striking the six African-Americans.

(2) Suppression

Motion to Suppress Confession
The defendant argues that the trial court erred when it failed to suppress his confession. In his motion to suppress, the defendant alleged that he was under arrest and in custody without probable cause at Betts' apartment. Thus, his confession must be suppressed. In his motion for new trial, the defendant again raised this issue. He called additional witnesses and, unlike his pretrial motion, testified on his own behalf. In our review of the trial court's denial of the defendant's pretrial motion to suppress, we limit our consideration to the evidence presented to the trial court. The additional evidence presented by the defendant on this issue after trial we consider only insofar as it relates to his claim that his counsel inadequately represented him on his pretrial motion to suppress.
The question raised by the defendant's pretrial motion depended upon the trial court's determination of whether the defendant was in custody prior to the time he was warned of his Miranda rights which occurred just prior to making his confession. In framing the issue, the State acknowledged that there was no probable cause to arrest the defendant when the detectives encountered *660 him at Betts' apartment the morning after the shooting. The State argued at the suppression hearing that the defendant voluntarily agreed to accompany them to the police station and was not in custody prior to the time they warned him of his Miranda rights. The defendant contends that he was under arrest at Betts' apartment and continued to be in custody until warned of his Miranda rights at the station. After hearing the evidence, the trial court determined that the defendant voluntarily accompanied the detectives to the station and was not in custody or under arrest before they warned him of his Miranda rights.
Critical to our inquiry are the facts surrounding the encounter between the detectives and the defendant at Betts' apartment and the totality of circumstances existing before the defendant was warned of his Miranda rights just prior to confessing his involvement in the shooting of Stacey Quinn.
Our standard of review is set forth in State v. Toothman, 267 Kan. 412, 416, 985 P.2d 701 (1999):
"An appellate court reviews the factual underpinnings of a district court's decision `by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. An appellate court does not reweigh the evidence. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review.' [Citations omitted.]"
The trial court was called upon to determine whether the defendant was in custody prior to receiving a Miranda warning. If the defendant was not in custody, his resulting confession would not be tainted by a violation of the defendant's rights under the Fourth Amendment to the United States Constitution. The key question for the trial court was whether the defendant was in custody.
This court has previously dealt with the question of custody. In a well-written opinion by Justice Abbott, this court in State v. Fritschen, 247 Kan. 592, 802 P.2d 558 (1990), discussed in depth custodial interrogation and the standard to be applied by trial and appellate courts in addressing the question we now face. After an exhaustive analysis of federal and Kansas cases, Fritschen concluded that the "standard to be used in Kansas is the objective standard of a reasonable person." 247 Kan. at 603. Again, in State *661 v. William, 248 Kan. 389, 405, 807 P.2d 1192, cert. denied 502 U.S. 837 (1991), we reiterated:
"In State v. Fritschen, 247 Kan. 592, 600-03, 802 P. 2d 558 (1990), this court determined that the proper analysis of whether a person is `in custody' is an objective analysis that ignores subjective beliefs, personality, and mental capacity of the defendant. The proper analysis is how a reasonable person in the suspect's position would have understood the situation. Then, if a reasonable person would have felt that he was `in custody,' any statement given before the suspect was advised of his or her Miranda rights must be excluded."
Thus, the standard to be applied is that the appellate court reviews the factual underpinnings of a district court's decision that the defendant was not in custody by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. The determination is made based upon a totality of the circumstances applying the objective standard of a reasonable person. See Fritschen, William, and Toothman.
The State bore the burden of establishing that the defendant's pretrial confession was voluntary and admissible. See State v. Groschang, 272 Kan. 652, 662, 36 P.3d 231 (2001). The State called only one witness, Detective Zeigler. He testified that, after determining the Chevrolet Cavalier belonged to Betts, he, along with Detective Golubski, went to Betts' apartment. Upon reaching Betts' apartment, Zeigler discovered the defendant was at the apartment. Zeigler and Betts went outside to discuss Betts' car. Zeigler explained:
"A. Like I was saying, I told the district officer he [the defendant] had warrants and went upI said, Mr. Washington, I'd like you to come to the detective bureau if you would; Ms. Betts is going to the detective bureau with us. She agreed to accompany us. He was very cooperative, put on clothing, and went with the district patrol officer because we took Ms. Betts in my car.
"Q. [Prosecutor] All right. And when he agreed to come down and talk to you, did you at any time advise him that he was under arrest?
"A. No.
"Q. You said there were warrants out. And were those like city warrants?
"A. I think they were traffic tickets.
"Q. Was he under arrest at that point in time for those tickets?
"A. No.
"Q. Okay. He agreed, though, to go down and answer any question that you might have of him?

*662 "A. Yes."
On cross-examination, defense counsel inquired further:
"Q. Now, at that point in time had you advised him that he was free to go?
"A. No. At that point I just said, Mr. Washington, would you be willing to come down to the detective bureau and talk to us, we have some questions to ask you as well as Nina [Betts] and Nina is going with us. And he said, sure, no problem.
"Q. You never gave him the alternative you could come to the detective bureau; if you don't want to go to the detective bureau, you are free to go?
"A. Sure, I did. If he would have said no, I would have said okay.
"Q. You never told him
"A. No, I did not say 
"Q.  it was all right for him to tell you no and you don't have to accompany me?
"A. I didn't tell him `Mr. Washington, you don't have to come with us.'"
It was also established during cross-examination that at the time the detectives went to Betts' apartment they did not know the defendant and had no idea whether the defendant had any connection to the crime they were investigating.
Zeigler testified that after the defendant left with another officer for the detective bureau, he asked Betts' permission to search the apartment. Betts consented to the search. The search of the apartment became bogged down upon the finding of the gun because, according to Zeigler, the identification team had to be summoned to identify the gun and photograph the scene. The detectives had no further contact with the defendant for approximately 2 hours, the time it took to complete the search.
Zeigler testified that when he arrived at the detective bureau after the search, he sent the defendant to the television room and began speaking with Betts. The statement with Betts began at 11:16 a.m. and ended at 11:35 a.m. Upon concluding the statement, Zeigler and Golubski conferred and determined that they wanted to compare a bullet taken from Betts' apartment with a bullet from the crime scene. The detectives had not yet definitively linked the gun from Betts' apartment with the gun that killed Quinn.
Zeigler testified that he and Golubski began talking with the defendant sometime between 12:30 p.m. and 12:45 p.m. and were *663 finished taking the defendant's statement at 1:20 p.m. During the statement, the defendant implicated himself as Quinn's killer.
In response to the State's question about what happened just prior to taking the defendant's statement, Zeigler stated:
"A. We took Mr. Washington from the TV room, brought him back to our office. Detective Golubski, who was my partner at the time, he introduced ourselves to Mr. Washington and told him `we appreciate you coming down, you don't have to talk with us if you don't want to, we have some things to go over with you.' At that point Detective Golubski informed him as to the way the investigation was going. Because at this point we don't have any eyewitness or anything that says Mr. Washington shot and killed Ms. Quinn.
"Q. Okay.
"A. So we are not 100 percent sure that he's even involved.
"Q. Okay. And had there been any comparison done on the gun and any ballistics done to compare it to any bullets or shell casings from the crime scene.
"A. No, not at that point.
"Q. So you didn't know whether the gun actually matched up either?
"A. That normally takes more time than we had. That takes a few weeks to get that done."
Zeigler continued:
"A. Detective Golubski laid out everything that was inconsistent on Ms. Betts' statement: The car at the crime scene, the gun in the apartment. And at one point Mr. Washington become concerned that he was going to have a fair shake because he said he had been in trouble once before and things didn't go right when he talked to the police. Detective Golubski told him `you understand that you don't have to talk to us if you don't want to, we'd like to know what happened, there's a lot of pieces that we don't have here that's going on.' And Mr. Washington at that pointhe said `are you guys going to listen to me,' and he began crying uncontrollably.
"Q. And what happened next?
"A. We offered Mr. Washington some Kleenex and some water, tried to get him calmed down. Detective Golubski and I conferred in the hallway as to what he was getting so upset about at that point. We were thinking that he's probably going to implicate himself in the homicide. It took some time to get him calmed down. He was real remorseful. He was concerned about Ms. Betts and what was going to happen to her because she was a city employee. And at that point once we got him calmed down where he could talk again, we advised him of his rights and went into his statement."
Detective Zeigler's testimony consists of 40 pages, 20 pages of direct examination and 20 pages of cross-examination. After arguments of counsel, the trial court ruled:

*664 "The Court: Well, I don'tdon't have any evidence before me that the defendant was under arrest. Detective Zeigler clearly said we asked him if he would come down to the police department. He came down voluntarily. They could have arrested him based upon the warrants. And I'm sure from a strategic standpoint they didn't want to. And if he would agree to come down and cooperate with them and they could question him, they would have been better off and he would have cooperated with themor would have been more likely to. If they [would have told] him he's got the traffic warrants or taken him in, certainly the cooperation may have ended at that point. But that certainly was well within their rights to make it voluntary on his part and he was willing to do so. I don't have anything before me that indicates that he was under arrest."
The defendant's counsel then submitted several cases to support his position that the defendant was in custody based upon a show of authority by three officers and the fact that the State admitted no probable cause existed for the defendant's arrest. The court agreed to read the authority submitted and indicated that if the cases supported the defendant's position, the court would change its mind. However, before voir dire, the judge noted that he had reviewed the authority submitted by the defendant:
"And based upon what I have in front of me from the testimony onas I say, I think it was Wednesday, I don't find that the defendant was under arrest at the time that he was in custody. The testimony of Detective Zeigler was that they asked him if he would come down and talk and he came down voluntarily, was cooperative, and that he could have left. Based upon the testimony I heard, I find that he was not in custody and, therefore, the motion to suppress is denied."
The evidence presented through Zeigler established that the defendant initially agreed to accompany the detectives to the station. In his brief on appeal, the defendant admits as much by stating that although he may have initially gone to the station voluntarily, he was clearly being detained and at some point had been seized. The other evidence before the court indicated that the defendant was not in an interrogation room but was in a victim's room with a television set available. He did wait approximately 4 hours at the station, but most of that time was accounted for based upon the delay faced by the detectives in searching Betts' apartment.
The defendant, according to the evidence before the trial court, was not advised of the outstanding warrants and was not formally arrested or handcuffed. He was asked if he would come to the *665 station to answer questions at a time when the detectives did not know who he was and did not suspect him of the crime they were investigating. The defendant was free not to go to the station and would not have gone there had he declined the invitation. Other than the time lapse after the defendant came to the station, most of which was consumed by a search of Betts' apartment and by the questioning of Betts, there was no evidence to establish that the defendant was in custody.
The defendant cites Dunaway v. New York, 442 U.S. 200, 206-07, 60 L. Ed. 2d 824, 99 S. Ct. 2249 (1979), and State v. Mayberry, 248 Kan. 369, 374, 807 P.2d 86 (1991). The defendant in Dunaway was picked up by police officers, although the officers did not have probable cause to arrest him. Although the defendant was not told he was under arrest, he would have been physically restrained had he attempted to leave. The defendant "was never informed that he was `free to go.'" 442 U.S. at 212.
In Mayberry, the defendant was ordered from his vehicle at gunpoint, handcuffed, and transported to the police station. He was not informed he was free to go and would have been restrained had he tried. Mayberry held that under those facts, the defendant was in custody. 248 Kan. at 375.
In both Dunaway and Mayberry, the evidence established that the defendants would have been restrained had they tried to terminate contact with the law enforcement officers. Here, Detective Zeigler testified that if the defendant had declined his request to answer questions at the station, he was "free to go." The evidence established that the defendant voluntarily agreed to accompany an officer to the station to answer questions. The delay at the bureau was caused by the search of Betts' apartment, which became bogged down upon the discovery of the gun. Last, the defendant, while waiting for Betts' interview to end, waited in the victims' room of the detective bureau where he could watch television.
The trial court determined from the evidence offered at the suppression hearing that the defendant had not been arrested and was not in custody prior to the time he was given a Miranda warning at the police station. The decision of the trial court is supported by substantial competent evidence. In our de novo review of the *666 legal question relating to custody, we conclude as a matter of law based upon the evidence before the district court that the defendant was not under arrest or in custody prior to the time a Miranda warning was given by the detectives.

Ineffective Assistance of Counsel
After trial, the defendant filed a motion for a new trial, and the trial court conducted a hearing on the motion on May 11, 2001. The defendant was represented by his new attorney, Nancy Roe. The defendant argued the trial court erred in its pretrial ruling on the suppression issue. The trial court asked the new counsel whether she was arguing that the court had made a mistake in its initial ruling or whether she was arguing that prior defense counsel was ineffective because he failed to present additional evidence. Counsel responded that she was advancing both arguments.
The defendant called two additional witnesses and testified on his own behalf. Witness Betts said that she and the defendant did not ride in the same vehicle as she did when going to the station. Witness Detective William Michael testified that he first saw the defendant at the station with Detective Golubski and Detective Zeigler, who asked Detective Michael to sit with the defendant in the victim's room. Detective Michael vaguely remembered escorting the defendant to the restroom. The defendant's attorney pressed Detective Michael about the defendant's custody status:
"Q. How is it, Detective Michael, that you didn't know he was in custody if a uniformed officer had been sitting with him?
"A. When they asked me if I would sit with him, especially in the victim's room, I have no idea if he was a witness, a suspect, or anything of that nature. They just asked me if I would just watch him."
The defendant also called Detective Zeigler to testify again. Detective Zeigler testified that he summoned an officer to transport the defendant to the detective bureau before speaking with the defendant to get his permission. Detective Zeigler believed that it was possible that he informed the defendant that there were some outstanding bench warrants for the defendant's arrest. However, Detective Zeigler said that he was more certain that he merely asked the defendant to come to the detective bureau without mentioning *667 the warrants. On cross-examination, the State directed Detective Zeigler to his report which specifically indicated that the defendant was not informed of the warrants.
Detective Zeigler testified that the officer who transported the defendant to the detective bureau may have frisked the defendant before the defendant entered the vehicle. However, Detective Zeigler explained that it is the policy of officers to pat down people before letting them ride in a caged vehicle because to not do so is dangerous. Detective Zeigler did testify that he told the officer transporting the defendant to the detective bureau that there were warrants for the defendant's arrest.
While the defendant did not testify during his pretrial motion to suppress, he did testify at the hearing on the motion for a new trial. He stated that Detective Zeigler returned to the apartment after speaking with Betts and said to the defendant, "Look, Marcus, we know you have some traffic warrants, nothing major. We would like you to come downtown and answer a few questions." The defendant said he was frisked before he entered the officer's vehicle. The defendant said that the officer was always in his presence until Detective Michael took over. The defendant testified he believed he was under arrest for the traffic warrants and did not feel like he could leave.
We have considered the posttrial evidence on the issue of whether the defendant's trial counsel adequately represented him in his motion to suppress. The defendant faults his defense counsel for not presenting additional evidence on that motion. In his motion to suppress hearing, the defendant elected not to testify. He was present at the time the motion was presented. Given his claim of interest in the motion, it is difficult to understand why the defendant would not have pressed his counsel to take the stand on his motion to suppress.
In ruling from the bench on the motion for a new trial, the trial court found that the only new information that was not presented at the original hearing on the motion to suppress was the testimony of the defendant that he believed he was in custody and that he was guarded by Detective Michael all the while before he confessed. The court found that the testimony showed that the defendant *668 went to the detective bureau voluntarily. The court also rejected the argument that the defendant's pretrial counsel was ineffective.
The defendant argues his pretrial counsel was ineffective when he failed to secure suppression of the defendant's statements to the police detectives. Keeping in mind that it was the defendant's testimony after the fact that cast his presence at the station as involuntary and custodial, two observations must be made. First, we are presented with a finding by the trial court that the defendant's testimony on these points was self-serving and not credible. On appeal, we do not reweigh the evidence, pass on the credibility of witnesses, nor do we resolve conflicts in the evidence. See Toothman, 267 Kan. at 416. Second, we note that the defendant had the opportunity to testify regarding his pretrial motion to suppress and present any evidence that would rebut or add to what Detective Zeigler had to say. He elected not to testify, although the record indicates that prior to the suppression hearing he wrote to his counsel with suggestions on how to proceed with his motion. This observation supports the trial court's determination that his posttrial testimony was self-serving and not credible.
We review the trial court's decision that the defendant's counsel adequately represented him on the motion to suppress based upon the two-part test for ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984):
"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."
The performance and prejudice prongs of the ineffective assistance of counsel inquiry are mixed questions of law and fact on appeal requiring de novo review. State v. Sperry, 267 Kan. 287, 297, 978 *669 P.2d 933 (1999). However, the appellate court does not reweigh the evidence or pass upon the credibility of the witnesses but, rather, must "accept as true the evidence and all inferences to be drawn therefrom to support the findings of the trial court and disregard any conflicting evidence or other inferences that might be drawn therefrom." State v. Orr, 262 Kan. 312, 322, 940 P.2d 42 (1997).
The defendant fails to establish that his counsel's performance was deficient. Trial defense counsel vigorously cross-examined Detective Zeigler. The defendant was present and had expressed to his counsel the approach to his motion. Yet, the defendant elected not to testify or call any additional witnesses until after trial. At that time, he offered his subjective belief that he was in custody, a factor that would not weigh heavily in a final suppression decision. See State v. Fritschen, 247 Kan. 592, 600-03, 802 P.2d 558 (1990). We acknowledge that the additional evidence presented after trial concerning the defendant's motion to suppress would have made for a closer question and more difficult decision by the trial court, but the failure to call additional witnesses was not an error so "serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 678.
Under Strickland, prejudice is impossible to find unless the defendant shows that with the additional testimony the outcome of the hearing on the motion to suppress would have been different. The evidence presented posttrial showed the defendant was invited to the detective bureau and went there on his own volution. Nothing in the testimony presented posttrial changes the conclusion that the defendant waited in the victim's room where a television was available. Neither the defendant nor Detective Michael was told that the defendant was under arrest. Without evidence showing that the motion to suppress would have been different based upon the additional testimony, it is impossible to say that the defendant was prejudiced by any ineffective assistance of counsel. Thus, the defendant's argument fails under the second prong of Strickland as well.

*670 (3) Exclusion of evidence in support of the defendant's trial theory.
The defendant argues that the trial court committed error by excluding evidence of the plea negotiations in a separate case.
"A defendant must be permitted to present a complete defense in a meaningful manner, and exclusion of evidence which is an integral part of a defendant's theory violates the right to a fair trial. However, a defendant's right to call and examine witnesses is not absolute and on occasion will be overridden by `other legitimate interests in the criminal trial process.'" State v. Green, 254 Kan. 669, 675, 867 P.2d 366 (1994).
The admissibility of evidence lies within the sound discretion of the trial court. State v. Lumley, 266 Kan. 939, 950, 976 P.2d 486 (1999). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. 266 Kan. at 950.
The defendant relies upon State v. Mixon, 27 Kan. App. 2d 49, 53, 998 P.2d 519 (2000) ("The defendant's fundamental right to a fair trial is violated if relevant, admissible, and noncumulative evidence which is an integral part of the theory of the defense is excluded."). Mixon affirmed the conviction because, while the trial court limited some of the defendant's evidence, the defendant was still able to present four witnesses in addition to his own testimony. 27 Kan. App. 2d at 53-54.
While the defendant admits that he was able to present his defense that he suffered from a mental disease or defect in the form of PTSD, he argues the exclusion of evidence that Hill had been at large was critical to his defense. The State argues that the trial court allowed the defendant to present evidence of his theory of defense, along with sufficient evidence to support that theory.
The defendant admits he was able to present evidence he suffered from PTSD. However, the defendant stresses that without evidence that there was a plea bargain between Hill and the State resulting in probation for Hill which would have showed the jury that Hill was free to further terrorize the defendant, the jury could not appreciate the stress under which the defendant suffered. *671 However, the defendant called his ex-wife to testify about the Hill incidents, establishing that the defendant was under continuous fear. The defendant also testified about his fear. Further, two psychologists supported his theory. The defendant's view of this issue is skewed for he assumes the jury believed Hill was safely locked up. The defendant's own evidence of his fear belies this notion.
The State also correctly points out that Dr. Parks testified that part of the defendant's problem was the fact that the person who was terrorizing him "was not held but for a very short time," and that "[t]here was a process that went on where the person was put on probation." From this evidence, the jury would have had no reason to believe Hill was in prison. The defendant fails to establish that the trial court abused its discretion in limiting the evidence of plea negotiations between the State and Hill.

(4) Prosecutorial misconduct.
The defendant argues that the prosecutor's criticism of the mental defense was prosecutorial misconduct. Our standard of review of this claim is well established:
"The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. Second, we must decide whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal. [Citation omitted.]" State v. Pabst, 268 Kan. 501, 505, 996 P.2d 321 (2000).
In State v. Wilt, 273 Kan. 273, 279, 44 P.3d 300 (2002), this court cited three factors for determining whether prosecutorial misconduct requires a new trial:
"(1) whether the misconduct was so gross and flagrant as to deny the accused a fair trial, (2) whether the remarks show ill will on the prosecutor's part, and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that it can be said that the prejudicial remarks of the prosecutor were likely to have little weight in the minds of the jurors. [Citation omitted.]"
*672 During her closing arguments, the prosecutor argued that "post-traumatic stress disorder does not give someone a license to kill." The defendant's objection to this argument was sustained, and the jury was admonished to disregard the argument. When she began her argument again, the prosecutor said that the defendant's defense attorney "wants [the jury] to find that posttraumatic stress disorder excuses [the defendant's] conduct." This time the defendant's objection was overruled. On appeal, the defendant complains that the prosecutor "diminish[ed] the existence of the posttraumatic stress disorder and the mental disease or defect defense."
We dismiss the first instance of alleged misconduct on the basis of the trial court's admonition to the jury. See State v. Moore, 242 Kan. 1, 10, 748 P.2d 833 (1987) ("The jury was instructed to disregard the first comment by the State's attorney, and there is no indication that this instruction failed to cure any prejudice to the defendant.").
With respect to the second instance of alleged misconduct, the defendant complains that it was the prosecutor's statement to the jury that the authority for not holding the defendant responsible for his conduct because of PTSD was based upon the opinion of the defendant's attorney rather than upon the law. Kansas statutory law provides that a defendant should not be accountable for his actions if "as a result of mental disease or defect, [the defendant] lacked the mental state required as an element of the offense charged." K.S.A. 22-3220. However, the jury was clearly instructed by the trial court on this issue. We doubt that the comment of the prosecutor diminished the defendant's defense.
Assuming that the prosecutor's argument was outside the considerable latitude allowed in discussing the evidence, the defendant fails to establish that the closing argument was so gross and flagrant as to prejudice the jury against the accused and deny a fair trial. First, the comments are a few lines in a trial transcript with over 1300 pages. Second, the defendant has not established ill will on the part of the prosecutor. Third, the evidence of the defendant's guilt was overwhelming.

(5) Limitation of cross-examination.
The defendant argues the trial court erred in limiting his cross-examination of Dr. Logan, the State's rebuttal witness. Specifically, *673 the defendant argues he should have been able to inquire of Dr. Logan regarding prior assaults on the defendant's life. The defendant also argues he should have been able to cross-examine Dr. Logan regarding work Dr. Logan did on a prior unrelated case in State v. Jorrick, 269 Kan. 82, 4 P.3d 610 (2000).
During the defendant's cross-examination of Dr. Logan, the defendant's attorney asked Dr. Logan about an incident which happened to the defendant in 1993. The prosecutor objected on the grounds that the defendant's attorney was assuming facts not in evidence. The court questioned whether such evidence had been admitted. The defendant's attorney continued to ask about specific details of the 1993 incident until the prosecutor asked for a bench conference. The trial court ruled that the prior testimony of the defendant's prior experiences had been admitted in general terms and that Dr. Logan should not be asked to go beyond a general reference to the defendant's past experiences. The defendant's attorney was able to do just that:
"Q. Dr. Logan, the multiple shots outside of Mr. Washington's house and multiple shots inside his house and the threat that a younger brother would be killed, were those events that would cause trauma?
"A. Yes, those are reasonably expected to produce fear."
The defendant's attorney continued to probe Dr. Logan on the matter, and the State lodged no objection to this testimony.
The defendant's attorney also asked Dr. Logan about work Dr. Logan had done on Jorrick. The State objected that the evidence was irrelevant. The defendant's attorney argued that the question about the Jorrick case went to Dr. Logan's credibility. The defendant's attorney said that Dr. Logan's work in Jorrick involved dissociative symptoms. The trial court ordered the defendant's attorney to stay away from the facts of Jorrick but allowed him to inquire as to dissociative symptoms.
The Sixth Amendment to the United States Constitution provides that the criminal defendant has the right "to be confronted with witnesses against him." The Confrontation Clause affords the accused the right to cross-examination. State v. Rinck, 256 Kan. 848, 854, 888 P.2d 845 (1995). However, the criminal defendant's *674 right to cross-examination is generally subject to the rules of evidence. 256 Kan. at 854. "The scope of cross-examination is a matter within the sound discretion of the trial court and, absent a showing of clear abuse, the exercise of that discretion will not constitute prejudicial error." State v. Vargas, 260 Kan. 791, 798, 926 P.2d 223 (1996).
The trial court did not abuse its discretion in limiting the cross-examination of Dr. Logan. It is clear that it was the details of the earlier incident which the trial court attempted to exclude from the trial. Those details were not the subject of Dr. Logan's direct examination which focused on criticism of Dr. Parks' analysis. The subject matter of cross-examination may not exceed the subject matter of the examination in chief. K.S.A. 2002 Supp. 60-243(b). The trial court was within its discretion to limit the cross-examination to the exclusion of details of an incident which occurred several years prior. This, combined with the fact that the defendant was able to cross-examine Dr. Logan about the general effect of the earlier incident demonstrates that the defendant suffered no Confrontation Clause violation in this case.
In regard to Jorrick, the defendant argued he was unable to test Dr. Logan's credibility. On appeal, the defendant suggests that Dr. Logan's testimony depended on who was employing him, the State or a criminal defendant. This court in State v. Jacques, 270 Kan. 173, 181-82, 14 P.3d 409 (2000), held:
"The Confrontation Clause of the Sixth Amendment affords the accused of the right to cross-examination. [Citation omitted.] The exposure of a witness' motivation in testifying is a proper and important function of cross-examination. [Citations omitted.] A witness can be questioned about possible bias and motivation for testifying regardless of the scope of the direct examination. Failure to allow a party to cross-examine a witness about possible bias or motivation for testifying is error. [Citation omitted.] However, the error may be harmless and does not automatically require reversal. [Citations omitted.]"
In this case, the defendant was able to raise the question of bias. The defendant's attorney asked Dr. Logan how much money he charged an hour. The defendant's attorney asked Dr. Logan whether he had worked for the prosecutor's office before. Thus, the defendant exposed any motivation Dr. Logan may have had for *675 testifying on behalf of the State. The excluded evidence was well within the trial court's discretion, and the trial court did not err.

(6) Insufficiency of evidence to support first-degree premeditated murder.
The defendant argues the State presented insufficient evidence to sustain (1) the jury's finding that the defendant did not lack the mental state required to form the intent element of first-degree premeditated murder and (2) the jury's finding that the murder was premeditated.
The standard of review to a challenge of the sufficiency of the evidence is well known:
"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." State v. Jamison, 269 Kan. 564, 571, 7 P.3d 1204 (2000).
The evaluation of witness credibility is for the jury. State v. McCray, 267 Kan. 339, 343, 979 P.2d 134 (1999).

Posttraumatic Stress Disorder
The jury was instructed on mental disease or defect:
"Evidence has been presented that the defendant was afflicted by mental disease or defect at the time of the alleged crime. Such evidence is to be considered only in determining whether the defendant had the state of mind required to commit the crime. You are instructed the defendant is not criminally responsible for his acts if because of mental disease or defect the defendant lacked the necessary element of intent to kill."
On the verdict forms, the jury was given the option of finding the defendant not guilty solely on the basis of mental disease or defect.
The defendant has asked us to reweigh the evidence, which we cannot do. Three psychiatrists testified in this case. Dr. Logan raised serious questions challenging not only Dr. Parks' analysis but also the notion that the defendant actually suffered from PTSD. Dr. Logan testified that someone suffering from PTSD might fight if cornered but given the opportunity, would flee. Assuming the jury believed Dr. Logan, which this court must do *676 under the appropriate standard of review, the jury would have discounted the defendant's PTSD defense and found him guilty of the crimes charged.

Premeditation
The jury was instructed that premeditation meant "to have thought over the matter beforehand." The defendant tied his premeditation argument to the assumption that his actions were a result of his suffering from PTSD. Thus, his argument fails based upon our analysis above.

(7) Refusal to provide new counsel with trial transcript for motion for new trial and for sentencing and inadequacy of representation on sentencing.
The defendant argues that the trial court's failure to provide his posttrial counsel, who did not represent him at trial, with a transcript of the trial rendered his counsel's posttrial representation inadequate. Gregory Coggs represented the defendant at trial, which began October 10, 2000, and ended October 20, 2000. On December 8, 2000, this court indefinitely suspended Coggs from the practice of law in Kansas. See In re Coggs, 270 Kan. 381, 14 P.3d 1123 (2000). On the same day, the trial court appointed Nancy Roe to replace Coggs  not based upon Coggs' suspension but based upon the defendant's claim of ineffective assistance of counsel at trial.
There are two aspects to the defendant's argument. The first is the preservation for appeal of potential trial errors. The second is the denial of effective assistance of counsel at sentencing.
The defendant cites an Iowa case, State v. Brodene, 493 N.W.2d 792 (Iowa 1992), which involved similar facts. It was that court's remedy to excuse the new counsel from any preservation of error requirements in preparing and presenting the posttrial motions. 493 N.W.2d at 795. Such a remedy is appropriate in this case and eliminates the first aspect of the defendant's alleged error. The defendant's rights on appeal have not been prejudiced based on Roe not having preserved any issues for appeal. The defendant appears to concede as much in his brief on appeal.
*677 The second aspect of the defendant's argument is more troubling. The question is whether the defendant was adequately represented during sentencing. While the defendant does not argue that his new counsel was ineffective at sentencing, the defendant raises the issue of the fairness of his sentencing proceeding, and the State has had an opportunity to respond to that argument. Ordinarily, the appellate court will not consider an issue which has not been raised before the trial court and which has not been raised by the parties on appeal. However, we have the power to consider sua sponte an issue for the first time on appeal if to do so is necessary to serve the ends of justice or to prevent the denial of fundamental rights. State v. Puckett, 230 Kan. 596, 600-01, 640 P.2d 1198 (1982). A remand is not necessary if the ineffective assistance of counsel is apparent from reading the cold record. See State v. Cheeks, 258 Kan. 581, 593-94, 908 P.2d 175 (1995). Given the defendant's overall argument that he was denied a fair hearing at sentencing, and given our reading of this record, we are now compelled to consider the effectiveness of the defendant's counsel at sentencing. The facts are not in dispute, and the cold record speaks for itself as to the issue we address. The question becomes a legal determination under the record before us.
The defendant's new counsel Roe, because she did not represent the defendant during trial, requested a trial transcript to aid in her preparation for motion for new trial and sentencing. In response, the trial court suggested new counsel contact the defendant's trial counsel Coggs to discuss trial issues and sentencing. Coggs failed to attend a meeting Roe scheduled. Roe again requested a trial transcript. The court again suggested Roe contact Coggs, and again Coggs failed to attend a meeting Roe had scheduled. Roe was unable to reach Coggs a third time.
We have already addressed the failure to provide counsel with a transcript for the defendant's motion for new trial. The trial court's failure to order a trial transcript for Roe in regards to the defendant's motion for new trial was not error. We do not believe it was error for the trial court to deny Roe a trial transcript for sentencing. Roe was appointed on December 8, 2000, and the sentencing was not held until April 11, 2001. Thus, the defendant's *678 new attorney had over 4 months to prepare for sentencing. By reading the court file, she would have known that the defense of mental disease or defect was asserted. Although Roe found it impossible to meet with trial counsel Coggs, there were others she could have spoken with. She could have spoken with Dr. Parks and Dr. Hatcher about their testimony. She could have spoken with the defendant about his testimony and the underlying facts. She had ample time without a transcript to prepare for the defendant's sentencing hearing.
We note that it was the court which pointed out on the record that the psychiatric testimony involving PTSD was a matter that could be considered by the court in sentencing the defendant. Although not considered weighty enough to deter the court from imposing a hard 50 sentence, we note that even absent a record, the defendant's trial witnesses were still available. In a more relaxed sentencing proceeding, these witnesses could have offered additional testimony on the defendant's behalf. K.S.A. 2002 Supp. 21-4635 (b) provides:
"In order to make such a determination [sentence for murder in the first degree based upon the finding of premeditated murder], the court may be presented evidence concerning any matter that the court deems relevant to the question of sentence and shall include matters relating to any of the aggravating circumstances enumerated in K.S.A. 21-4636 and amendments thereto and any mitigating circumstances. Any such evidence which the court deems to have probative value may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements."
Moreover, various exhibits were in the record that may have been helpful to the defendant.
We are struck by the record of the sentencing hearing. Counsel did little if anything to represent the defendant during the sentencing hearing. Essentially, counsel absolved herself of responsibility by stating to the court that she had no transcript and thus was not in a position to add anything during sentencing. The record discloses the following:
"Ms. Morehead [Prosecutor]: "Additionally, judge, since this is a premeditated first-degree murder case, you are required under statute to first consider imposing *679 a Hard 50 sentence. And under the provisions of that statute, you have to find that there are aggravating circumstances that apply. In this case, there are two that come to my mind that specifically apply and would warrant the giving of a Hard 50.
"Ms. Roe: Your Honor, I don't mean to interrupt, but was there notice of Hard 50 in this case?
"Ms. Morehead: There is no requirement of notice.
"THE COURT: No longer a requirement. There was at one time for the 40, was there not?
"Ms. Morehead: Yes, Judge. There is no requirement that notice be given for Hard 50.
"THE COURT: Yeah.
"Ms. Morehead: Judge, two of the factors that I think are evident in this case are, first of all, the fact that Mr. Washington has a prior conviction for an offense that involves either great bodily harm or death . . . .
"The second one is the cruel and heinous nature of this offense. . . .
. . . .
"THE COURT: Ms. Roe.
"Ms. ROE: We would object to the Hard 50, your honor. Unfortunately, I'm not in a position to argue facts that I'm not aware of."
The above exchange indicates to this court that defense counsel was not aware of the statutory provisions relating to a hard 50 sentence even though she appeared for the defendant who was facing a hard 50 sentence. This portion of the record and defense counsel's failure to present any response on behalf of the defendant raises a genuine concern as to whether the defendant's counsel had read the provisions of the statute before sentencing. The record also raises genuine concern about the amount of time counsel spent preparing for this sentencing hearing even though she had a full 4 months to prepare.
The State in its brief on appeal argues that the defendant has failed to point to any evidence in the trial transcript that his new attorney could have used to rebut the State's argument. The State also assures this court that the trial court was on board throughout the process and therefore considered all the evidence, even evidence tending to show that the crime was committed "while the defendant was under the influence of extreme mental or emotional disturbance." Such a response misses the mark. The defendant was entitled to adequate representation by counsel familiar with the *680 statutory provisions relating to a hard 50 sentence. In this case, his counsel simply abdicated her position with the excuse that she had not been given a trial transcript.
We have no hesitancy in concluding within the analytical framework of Strickland that the defendant's attorney at sentencing made errors so serious that she was not functioning as "counsel" as that word is used in the Sixth Amendment. See Strickland v. Washington, 466 U.S. 668, 678, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Furthermore, the record supports the conclusion that the performance of the defendant's attorney at sentencing prejudiced the defendant's rights at sentencing. Under these circumstances, we must vacate the defendant's sentences and remand for resentencing.

(8) Violation of Apprendi in the hard 50 sentence.
The defendant argues this court should overrule State v. Conley, 270 Kan. 18, 11 P.3d 1147 (2000), cert. denied 532 U.S. 932 (2001), because under Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), the judge imposed a hard 50 sentence and violated the defendant's Sixth Amendment and Fourteenth Amendment rights. The defendant criticizes Conley's reliance on McMillan v. Pennsylvania, 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986). Conley was based upon Apprendi and McMillan; however, the defendant fails to cite any authority postdating those cases that would convince this court to change its course. See State v. Boldridge, 274 Kan. 795, Syl. ¶ 11, 57 P.3d 8 (2002). We reject the defendant's argument; Conley controls.
Finally, the defendant assigns six additional errors, most of which have been raised by appellate defense counsel.

A. Excluding evidence of the defendant's mental disease or defect.
The defendant argues in his pro se brief that the trial court erred in excluding relevant evidence of his mental disease or defect. Specifically, the defendant argues that the trial court erred in excluding evidence of Hill's plea negotiations with the State. We addressed *681 this argument above, and based upon our analysis, the defendant's pro se argument fails.

B. Limiting the defendant's cross-examination of the State's rebuttal witness.
The defendant argues in his pro se brief that the trial court erred in limiting the cross-examination of Dr. Logan. We addressed this argument above, and based upon that analysis, the defendant's pro se argument fails.

C. Refusal to accept the defendant's stipulation regarding his prior felony conviction involving a firearm.
The State accepted the defendant's stipulation regarding his prior manslaughter conviction. He argues in the alternative that error occurred because he did not enter into the stipulation on the record. However, no valid argument can be advanced that the defendant was denied the opportunity to present to the jury that he had on a prior occasion killed another person and was convicted of manslaughter.

D. Prosecutorial misconduct by admitting inadmissible evidence.
The defendant argues in his pro se brief that the prosecutor engaged in prosecutorial misconduct by admitting inadmissible evidence. The defendant argues the State violated a motion in limine in addition to the rules of evidence when Detective Zeigler testified that Betts "lied."
Initially, the defendant is mistaken as to the order of the witnesses in the State's case in chief. Betts testified before Detective Zeigler, not after. Betts also testified after Detective Zeigler in the defendant's case in chief. Regardless, the defendant fails to offer any authority for his argument that Detective Zeigler said, "she lied," when referring to Bett. Thus, the record does not support his claim of error and his claim is without merit.

*682 E. Refusing to grant the defendant's motion to suppress.
The defendant argues in his pro se brief that the trial court erred in suppressing his statements to the detectives. We addressed this argument above, and based upon that analysis, the defendant's pro se argument fails.

F. Ineffective assistance of counsel.
The defendant argues in his pro se brief that he suffered from ineffective assistance of counsel at trial. However, the defendant admits that his trial counsel was adequate in all respects except on his motion to suppress. We have addressed this argument, and his claim fails based on our resolution of that issue.
Convictions affirmed, sentences vacated, and case remanded for resentencing.
ABBOTT, J., not participating.
DAVID S. KNUDSON, J., assigned.