No. 81,808

STATE OF KANSAS, *Appellee*, v. MICHAEL D. JORRICK, *Appellant.*
(4 P.3d 610)

Opinion filed April 21, 2000.

*Janine Cox,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*William R. Ludwig,* county attorney, argued the cause, and *Carla J. Stovall,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Michael D. Jorrick, from his conviction for the first-degree murder of Michael Keezer. Jorrick was sentenced to life imprisonment. He raises six issues on appeal.

## I. SUFFICIENCY OF THE EVIDENCE

Jorrick argues that he had no intent to kill Keezer and that he only wanted to talk to him and resolve their continual fighting. He argues that because he had no intent to kill Keezer, there was insufficient evidence for the jury to find him guilty of first-degree murder.

When we view the evidence as we are required to view it, the facts are as follows. Jorrick and Keezer had a mutual female friend, Rachael Blasko. They had a history of confrontations and altercations as a result of their attraction to Blasko.

Jorrick and Keezer had a number of fights in the year and a half preceding Keezer's death. Keezer was much bigger than Jorrick and although Jorrick instigated some of the fights by "mouthing

off" to Keezer, he was afraid of him because of the difference in their sizes.

On the night of Keezer's death, there was an outdoor party south of Glen Elder at the Cunningham farm in Mitchell County, Kansas. Jorrick and Keezer began fighting, but the fight was quickly broken up by mutual friends.

After the fight, Jorrick told a friend that he wanted to go home "to get something." At a prior fight between Jorrick and Keezer, Jorrick had pulled a knife to protect himself, and his friends felt he wanted to go home to get his knife. Jorrick, without permission, took a friend's car and drove to his friend's home. Jorrick then walked to his own home, where he cleaned up and lay down on a bed. He testified that everything after that was just a blur. He took his mother's car and his unplugged shotgun (without the plug it would hold five shells) and drove to Blasko's home to see if Keezer was there, which he was not. Jorrick later located Keezer driving his pickup along the roadway. Jorrick flashed his lights and then the two of them ultimately parked side-by-side, each of them in their own vehicle. Jorrick told investigators that he saw a light go on in Keezer's pickup and that he reached down and picked up his shotgun and shot at the light. He claimed he was still in a "dream-like" state. Jorrick then drove home, told his mother that he thought he had just shot Keezer, and then went to bed.

Keezer's body was found about 6:30 a.m. the following morning. He had been shot three or four times with a 12-gauge shotgun. There was testimony that one of the wounds was inflicted from a distance of 1 foot. A total of five shots were apparently fired. When Keezer was found, the motor of his pickup was still running, the parking lights were on, and the driver's side window was rolled down. The investigators determined the dome light in Keezer's pickup would not go on when the driver's door was open.

Jorrick, his stepfather Ernest Porter, and his sister Tina went to the police station.

Porter gave officers a Remington 12-gauge shotgun and a laundered shirt. The investigators found a single shotgun shell in the front seat of Jorrick's mother's car, which Jorrick had driven to the scene. Jorrick readily admitted shooting Keezer. He did not know

how many times he shot Keezer, but did know and told the police there were five shotgun shells in the shotgun when he left his home and there were none in the gun when he returned to his home.

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in a light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Johnson*, 266 Kan. 322, 326, 970 P.2d 990 (1998). It is not the function of an appellate court to reweigh the evidence or pass on the credibility of witnesses. *Wisker v. Hart*, 244 Kan. 36, 37, 766 P.2d 168 (1988). A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Smith*, 245 Kan. 381, 393, 781 P.2d 666 (1989).

Jorrick's argument rests on two points: (1) Jorrick testified that he had no intent to kill Keezer but merely wanted to find Keezer so that they could talk, and (2) there was credible medical/psychological testimony that Jorrick suffered from diminished capacity and lacked the necessary intent to commit premeditated murder.

We hold the evidence is sufficient to support the conviction. In addition to what is set forth above, Jorrick testified that he took the shotgun in the car, fully loaded, when he went to look for Keezer. He testified that he never took the shotgun in his car unless he was going hunting. When he located Keezer, he stopped along the highway and shot Keezer four or five times at close range. When the evidence is viewed in the light most favorable to the State, a rational factfinder could find that Jorrick intended to kill Keezer.

Jorrick's second contention was that there was credible medical testimony which indicated that he lacked the sufficient mental capacity to have premeditated the killing of Keezer. Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. *State v. Rice*, 261 Kan. 567, 587, 932 P.2d 981 (1997); *State v. Henson*, 221 Kan. 635, 645, 562 P.2d 51 (1977).

Premeditation and deliberation may be inferred from the established circumstances of the case, provided the inference is a rea-

sonable one. In such case, the jury has the right to make the inference. *State v. Buie*, 223 Kan. 594, 597, 575 P.2d 555 (1978). The evidence of premeditation need not be direct and is often established by circumstantial evidence. *Smith*, 245 Kan. at 393.

Three experts testified regarding Jorrick's mental state. Dr. J.L.L. Ferando, from the Larned State Hospital, testified that Jorrick was not suffering from a major mental illness or disorder at the time that he killed Keezer. Dr. Ferando testified that Jorrick did not suffer from dissociative disorder. Robert Huerter, a staff psychologist at the Larned State Hospital, also testified that there was no indication Jorrick suffered from any major mental illness which would have prevented him from having the requisite mental state to commit first-degree murder. In other words, Jorrick was capable of forming the intent to kill. Dr. William Logan, from Kansas City, Missouri, testified for the defense that Jorrick was suffering from a dissociative disorder and that this condition prevented him from having the ability to premeditate and deliberate.

When the evidence is viewed in the light most favorable to the prosecution, a rational factfinder could conclude that Jorrick had the proper cognitive state to premeditate the killing of Keezer and that Jorrick was guilty beyond a reasonable doubt of first-degree murder.

## II. CHANGE OF VENUE

The determination of whether to change venue is entrusted to the sound discretion of the trial court; its decision will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant. The burden is on the defendant to show prejudice exists in the community, not as a matter of speculation, but as a demonstrable reality. The defendant must show: (1) that such prejudice exists in the community; and (2) that it is reasonably certain he or she cannot have a fair trial. *State v. Anthony*, 257 Kan. 1003, 1013, 898 P.2d 1109 (1995).

At a pretrial hearing, testimony was taken and exhibits were admitted. The testimony and exhibits set forth that a radio station with an audience of approximately 5,000 had broadcast reports concerning the case 36 times between May 5, 1997, and August 7,

1997. Jorrick's name was mentioned in approximately two-thirds of the broadcasts. Jorrick also presented testimony that the Cawker City Ledger, with 421 subscribers in Mitchell County, ran articles concerning the case four times prior to the trial. Testimony was also taken concerning the Beloit Daily Call, which has a circulation of 1,800 in Mitchell County. The Beloit Daily Call published seven articles concerning the case. Two witnesses further testified that the community was "shocked and angry over the incident" and that others were "shocked" and "outraged." The trial court denied the motion to change venue.

Media publicity alone has never established prejudice per se. *State v. Ruebke*, 240 Kan. 493, 500, 731 P.2d 842 (1987). Jorrick has the burden of proof to show that there was "so great a prejudice" against him that he was not able to "obtain a fair and impartial trial." K.S.A. 22-2616(1). Two witnesses testified that the community was "shocked" and "outraged" over the murder of Keezer. Emotions such as shock and outrage are understandable, given the violent and senseless death of a young man in the community. Prejudice must not be a matter of mere speculation but must be a "demonstrable reality." *Anthony*, 257 Kan. at 1013. Although Jorrick made a showing before the district court that there had been a significant amount of media coverage of the homicide, Jorrick failed to show how the media coverage prejudiced his right to a fair trial and failed to show that a fair and impartial jury could not be selected to hear his case.

The trial court did not abuse its discretion in denying Jorrick's motion for a change in venue.

## III.   INDIVIDUAL VOIR DIRE

The purpose of the voir dire examination is to enable the parties to select competent jurors without bias, prejudice, or partiality. The nature, scope, and manner of the voir dire examination lie within the sound discretion of the trial court. *State v. Shannon*, 258 Kan. 425, 433, 905 P.2d 649 (1995); *State v. Zamora*, 247 Kan. 684, 692, 803 P.2d 568 (1990). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court,

then it cannot be said that the trial court abused its discretion. *State v. Wagner*, 248 Kan. 240, 242, 807 P.2d 139 (1991).

In denying the motion to individually voir dire the members of the panel, the court stated that "counsel shall examine panels of eighteen (18) with the balance of the potential jurors being sequestered" and that "side-bar shall be held to the extent necessary to ensure candid responses to counsel's inquiry as to juror qualifications to sit as jurors in the above case."

Although the jurors were not individually questioned regarding their feelings about this case, the court did take special precautions to voir dire the individual panel members when it became apparent that they might have had a relationship with Keezer or Keezer's family.

There has been no showing that the parties were unable to select competent jurors who were free from bias, prejudice, or partiality. The court did individually voir dire panel members when it became necessary. The trial court did not abuse its discretion in denying the motion to individually voir dire the jury panel.

## IV. SUPPRESSION OF STATEMENTS

An appellate court reviews a trial court's decision in a suppression of evidence hearing with great deference to the factual findings of that court. However, the ultimate determination of that decision is a legal question requiring independent appellate determination. *State v. Vandiver*, 257 Kan. 53, Syl. ¶ 6, 891 P.2d 350 (1995).

When a motion to suppress is denied prior to trial, the moving party must object to the evidence at trial to preserve the issue on appeal. *State v. Milo*, 249 Kan. 15, 18, 815 P.2d 519 (1991).

On May 4, 1997, Jorrick, Porter, and Tina went to the Law Enforcement Center in Beloit to speak to KBI investigators about the death of Keezer. KBI investigator William Pettijohn handed Jorrick the standard KBI *Miranda* form. Pettijohn instructed Jorrick to read the form, which he did. Pettijohn then read the form to Jorrick. Pettijohn asked Jorrick to respond to him audibly to each question with a "yes" or "no" answer. Jorrick responded that he understood each and every one of his constitutional rights. Jorrick

was asked if he wanted an attorney present, and he responded "no." The interview continued about 30 minutes. After the interview was complete, Jorrick was asked if he would provide the investigators with a written statement. Jorrick agreed, but Porter indicated to officers that they wanted an attorney present before anything was put in writing. Nothing was ever put in writing, and no other questions were asked after that point.

Prior to trial, Jorrick filed a motion to suppress statements he made to the KBI investigators when he voluntarily turned himself in, which the court denied. On appeal, Jorrick argues that the trial court erred when it denied his motion to suppress. Jorrick argues that he should have been asked if he wanted an attorney present, even though he was aware of his right to have an attorney present. Jorrick's brief does not detail what specific statements should have been suppressed, and our review of the record indicates that Jorrick never made a single objection to any of the testimony given by the KBI investigators who questioned Jorrick on May 4, 1997. Jorrick's counsel questioned Pettijohn on cross-examination regarding the interview with Jorrick and elicited several details regarding statements that Jorrick made to the KBI investigators. Moreover, Jorrick took the stand on his own behalf and voluntarily testified regarding his meeting with investigators and reiterated statements he made to them.

We hold that Jorrick failed to preserve this issue for appeal, as he failed to make a single objection to any of the testimony concerning his interview with investigators. The record also reveals that Jorrick's *Miranda* rights were protected and that Jorrick was fully aware of his constitutional right to have an attorney present during the KBI interview.

## V.   REQUEST FOR READ-BACK

Jorrick argues that the trial court erred when it refused the jury's request for a complete read-back of his testimony.

K.S.A. 22-3420(3) sets forth:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer

to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them . . . ."

Recently, in *State v. Juiliano*, 268 Kan. 89, Syl. ¶ 1, 991 P.2d 408 (1999), we discussed the standard of review for the read-back of testimony and stated:

"The means by which a trial court complies with a jury's request to have testimony read back is subject to its discretion. The trial court has the discretion to control the content of the read-back. The trial court is free to clarify the jury's read-back request where the read-back is unclear or too broad, or the read-back would jeopardize the manageability of the trial. Discretion rests with the trial court to clarify and focus the jury's inquiry."

During deliberations, the jury sent the judge a note requesting a read-back of Jorrick's testimony. Jorrick's testimony spans 95 pages of the record on appeal, but no transcript was available at the time of the jury's request. The judge informed the jury that there was no transcript and that it would be tiring for the court reporter to translate her notes and read them back to the jury. The judge asked the jury to go back into deliberations and to "see if they could decide on a portion of the transcript" that they were interested in.

The jury subsequently returned a note to the judge that stated: "After further consideration, we no longer need Michael Jorrick's testimony."

Recently, in *State v. Miller*, 268 Kan. 517, 997 P.2d 90 (2000), we stated:

"A trial court may not ignore a jury's request submitted pursuant to K.S.A. 22-3420(3) but must respond in some meaningful manner or seek additional clarification or limitation of the request. It is only when the trial court makes no attempt to provide a meaningful response to an appropriate request or gives an erroneous response that the mandatory requirement of K.S.A. 22-3420(3) is breached." 268 Kan. 517, Syl. ¶ 7.

"The trial court has the discretion to clarify and focus the jury's inquiry when the jury has requested a read-back of testimony." 268 Kan. 517, Syl. ¶ 8.

It would have been difficult and time consuming for the court reporter to read back all of her notes, which eventually covered 95 pages of the record on appeal. The court did not err in requesting the jury to specify which part of the testimony that it wanted to

have read back. The court responded to the jury's request in a meaningful manner.

The trial court did not abuse its discretion when it attempted to narrow the read-back of Jorrick's testimony by asking the jury to specifically set forth which portion of the testimony that it requested read back.

## VI.   DIMINISHED CAPACITY

Jorrick argues that the trial court erred when it refused to give an instruction on diminished capacity, as he had been drinking most of the day and admitted to having smoked some marijuana.

PIK Crim. 3d 54.12-B sets forth the instruction for diminished capacity:

"Diminished mental capacity [not amounting to insanity] may be considered in determining whether the defendant was capable of forming the necessary intent (set out the specific element of the crime)."

The Notes on Use to the instruction indicate that this instruction is only applicable to crimes committed *before* January 1, 1996. The crime in the case at bar was committed on May 4, 1997. Thus, it would not have been appropriate for the court to give an instruction on diminished capacity.

On May 13, 1995, the legislature passed H.B. 2223, which went into effect on January 1, 1996. A significant portion of the bill concerned the removal of the insanity defense and its replacement with a straightforward *mens rea* approach. K.S.A. 22-3219 was amended to remove any reference to insanity and instead focused on a lack of the "mental state required as an element of the offense charged." As a result of the bill, K.S.A. 22-3220 was enacted, which reads:

"It is a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged. Mental disease or defect is not otherwise a defense. The provisions of this section shall be in force and take effect on and after January 1, 1996."

K.S.A. 22-3220 prevents a defendant from raising insanity or diminished capacity as a defense. Kansas is among a minority of states that have done away with the insanity and diminished capacity defenses. In his article entitled *Insanity Denied: Abolition*

*of the Insanity Defense in Kansas,* 8 Kan. J.L. & Pub. Pol'y 253, 254-55 (1999), author Marc Rosen discussed the changes and stated:

"With the adoption of Kan. Stat. Ann. § 22-3220, Kansas followed Montana, Idaho, and Utah to become the fourth state to legislatively abolish the insanity defense. In order to understand Kansas's new approach to insanity, one must understand the concept of *mens rea.* All crimes, except for those imposing strict liability, require the defendant to possess the illegal state of mind (*mens rea*). *Mens rea* refers to a defendant's moral culpability or 'evil mind.' More specifically, *mens rea* refers to criminal intent, or the specific mental element contained in the applicable criminal statute. Kansas provides that criminal intent may be established by proof that the conduct of the accused person was intentional or reckless. . . .

. . . .

"Consequently, in place of the affirmative defense of insanity, Kansas enacted the '*mens rea* approach.' This approach permits a defendant to introduce expert psychiatric witnesses or evidence to litigate the intent elements of a crime. If the evidence negates the requisite intent, the defendant is entitled to an acquittal. However, there is one major limitation on the defendant's ability to introduce evidence corroborating or showing the existence of a mental disease or defect. Such evidence is only admissible as it specifically relates to the requisite *mens rea* of the offense. Therefore, the defense cannot introduce evidence as to the existence of a mental disease or defect to litigate the defendant's mental condition in general. The evidence must relate specifically to the defendant's ability to possess the requisite *mens rea* of the offense."

Professor Raymond Spring discussed the reasons for the legislature's change in his article *Farewell to Insanity: A Return to Mens Rea,* 66 J.K.B.A. 38, 45 (1997):

"By focusing on *mens rea* jury confusion should be eliminated or at least reduced substantially. Jurors will be given the instruction defining the crime and its mental state component, as they always are and must be, and they will be told that any evidence they may hear relating to the mental condition of the defendant is to be considered on that issue alone. They will be asked to so state if they find that the defendant is not guilty solely because of mental disease or defect which rendered the defendant incapable of criminal intent. . . . *Like insanity, diminished capacity disappears as a separate defense. Mens rea* simply carries diminished capacity to the logical extreme. With the separate definition of insanity gone, there is no barrier to accepting the idea that if one's capacity can be so diminished by mental disorder as to destroy the capacity to form a special intent, then it may in some circumstances be so diminished as to destroy capacity to form any criminal

intent at all. That has always been an illogical limitation, thought necessary only to avoid overlap of insanity and diminished capacity." (Emphasis added).

The result of H.B. 2223 was not only to eliminate the insanity defense but to eliminate the use of the instruction for "diminished capacity." All capacity defenses, for crimes which took place on or after January 1, 1996, focus on the *mens rea* of the crime.

The proper instructions concerning mental disease or defect, found at PIK Crim. 3d 54.10 and 54.10-A, were given in this case.

The trial court did not err when it refused to give an instruction on diminished capacity.

Affirmed.