No. 89,671

STATE OF KANSAS, *Appellee*, v. RICHARD I. PENNINGTON, *Appellant*.

(132 P.3d 902)

Opinion filed April 28, 2006.

*Christopher L. Hughes*, of Wichita, argued the cause, and *Carl F. A. Maughan*, of Law Offices of Carl Fredrick Alexander Maughan L.L.C., of Wichita, and *Roger L. Falk*, of Law Office of Falk & Owens, of Wichita, were on the briefs for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Charles L. Rutter*, assistant district attorney, *Nola Foulston*, district attorney, and *Phill Kline*, attorney general, were on the briefs for appellee.

The opinion of the court was delivered by

MCFARLAND, C.J.: Richard I. Pennington appeals his jury trial convictions of aggravated kidnapping (K.S.A. 21-3421), attempted aggravated kidnapping (K.S.A. 21-3421 and 21-3301), and two counts of aggravated robbery (K.S.A. 21-3427). The charges arise from three separate cases which were consolidated for trial.

In his appeal, Pennington raised numerous issues. A divided panel of the Court of Appeals affirmed the convictions. *State v. Pennington*, No. 89,671, unpublished opinion filed December 17,

2004. One member of the panel dissented from the majority's determination that the trial court's exclusion of the testimony of a defense expert witness, a psychologist, did not constitute an abuse of judicial discretion. We granted Pennington's petition for review on the expert witness issue only.

## FACTUAL BACKGROUND

The underlying facts recited by the Court of Appeals are not disputed and may be summarized as follows:

On February 4, 2002, Pennington pumped gas into his truck at a Total gas station. He then went inside the store, approached the counter, and pulled out his wallet. Instead of paying for the gas, he told the clerk to give him all of the money in the register. The clerk told Pennington there was no money. Pennington then displayed a knife. The clerk backed away from the register and repeated that there was no money. Another customer came into the store, and Pennington ran out, leaving in his truck without paying for the gas. The clerk identified Pennington at trial as the perpetrator.

One week later, on February 9, 2002, Pennington entered a local laundromat where Janet Robinson was doing her laundry. Pennington approached her, grabbed her by the collar, and said, "Lets go to the bathroom." Robinson struggled, scratching Pennington's eyes. Pennington began choking her and picked her up by her throat. She grabbed his hair, and they fell to the floor. Pennington ran out of the laundromat. During the struggle, Robinson suffered stab wounds from the knife Pennington was holding. She identified Pennington as the perpetrator in a photo lineup and at trial.

Four days later, on February 13, 2002, Pennington approached Stacey Ellis in the parking lot of the local Wal-Mart and asked if she had jumper cables to start his truck. She pulled her car next to Pennington's truck and unsuccessfully tried to jump start his truck. Ellis then went inside Wal-Mart. When she returned to her car, Pennington asked her for a ride to his house. She agreed. Once inside Ellis's car, Pennington directed her to an isolated area. He then grabbed her by the shoulder, displayed a knife, and told her to get out of the car and into the trunk. She refused, and Pen-

nington stabbed at her with the knife. She blocked the knife, receiving cuts to her hand and a small cut on her throat. Pennington told her he would kill her if she did not get into the trunk. She then complied. The car did not move for awhile, and Ellis concluded Pennington was getting into her purse. Later, Pennington stopped the car and asked her for her identification number for her ATM card. As the car continued on, she was able to pop the trunk open. She jumped out of the trunk when the car slowed, ran to a nearby house, and called the police. Ellis identified Pennington as the perpetrator at trial.

Pennington was stopped by an officer who observed him speeding and weaving in and out of traffic. When the officer approached the car, Pennington opened the car door and immediately told the officer he had just stolen the car from "some gal." The officer ordered Pennington out of the car. After getting out of the car, Pennington told the officer he had a knife in his pocket, and the officer confiscated it. The officer asked Pennington where he was coming from, and he said a woman had just jumped out of the trunk. Pennington gave the approximate location where she had jumped and told the officer, "[S]he damned-near got killed . . . she went running in front of cars." Pennington told the officer he was trying to get money from the woman's ATM when she jumped. The officer placed Pennington in the patrol car, radioed the information about the woman to dispatch, and then read Pennington his *Miranda* rights. Pennington then volunteered detailed information about the kidnapping.

At the law enforcement center, Pennington agreed to give a DNA sample, consented to the search of the car, and after being read his *Miranda* rights again, agreed to speak with officers. Pennington told of his participation in all three incidents. The purpose of each, he stated, was to obtain money.

Pennington was convicted of aggravated robbery for the Total gas station incident, attempted aggravated kidnapping for the laundromat incident, and aggravated kidnapping and aggravated robbery for the Wal-Mart incident. Denying all departure motions, the court sentenced Pennington to the presumptive sentence of 653 months for the aggravated kidnapping, and 61 months on each

of the other convictions. The court ordered the sentences to run consecutive to each other and consecutive to the federal sentence for which Pennington was on parole at the time of these offenses.

## FACTS RELATIVE TO EXPERT WITNESS BARNETT

The following procedural facts are relevant to the sole issue before us.

Prior to trial, the defense filed a notice of intent to rely on the defense of mental disease or defect under K.S.A. 22-3220. A defense expert, Dr. Robert W. Barnett, a psychologist, interviewed Pennington twice and produced two reports. In the first report, Dr. Barnett diagnosed organic personality disorder, delusional disorder, and personality disorder with dependent features. With respect to whether Pennington had the capacity to form criminal intent, Dr. Barnett's report stated:

"Mr. Pennington is not mentally retarded and otherwise does appear to have the mental capacity to form criminal intent. However, due to his delusional thinking and possibly an organic impairment of some type, he may have difficulty controlling his intent once it is formed."

The second report came about later after Pennington told police he had murdered women and buried their bodies. Dr. Barnett reinterviewed Pennington and prepared a second report, stating:

"I addressed the issue of competency to stand trial in my first report, and I do not wish to alter my opinion in that regard at this time. However my opinion relating to Mr. Pennington's ability to form criminal intent has taken a somewhat sharper focus. Mr. Pennington's delusional disorder is more pervasive and persistent than was originally my impression after the first interview. His behavior since then (i.e., false reports) is supportive of this diagnosis and indicates a more severe disorder than I originally surmised. Initially, it was my impression that Mr. Pennington could be successfully challenged regarding his various delusional beliefs, but I no longer feel that is the case."

The State filed a motion in limine seeking to exclude Dr. Barnett's testimony, examination records and reports. The State argued that because Dr. Barnett was of the opinion that Pennington was capable of forming criminal intent, his examination records and opinions would be irrelevant, inadmissible, and prejudicial.

The motion in limine was considered on the morning of trial. The court noted Dr. Barnett's second report was unclear about whether he was changing his opinion that Pennington was capable of forming intent. Defense counsel stated it was his understanding that Dr. Barnett was indicating that Pennington was unable to form criminal intent. The following exchange then occurred:

"THE COURT: He doesn't just say that though. . . .

"[DEFENSE COUNSEL]: I know, Your Honor, and I think I've been on this side of the argument on other occasions. All I can offer, Your Honor, is that he is a doctor governed by a different discipline, and sometimes those disciplines don't mesh. But in any event, we would respectfully submit that this is sufficient evidence to give the question to the jury. It's evidence of his mental capacity. As I say, we'll have treating doctors also come in and talk about Mr. Pennington's mental capacity, and this is his defense.

"THE COURT: Let me ask you this as simply as I can. Do you have any medical doctor who can testify pointblank that the defendant was unable to form specific intent on the dates that he's charged with these crimes?

"[DEFENSE COUNSEL]: Your Honor, the best way I can answer that question is if I put that question directly to Dr. Barnett, I'm going—I'm anticipating that he's going to say no, that he did not have the capacity to form the specific intent or the intent—

"THE COURT: So why didn't he put that in his report? That's why we have reports. We want to know what the man will testify to. We don't know now; and if he does testify to that, I think it's fair to say the State's just now hearing it for the first time, and so they can perhaps want to do more evaluations and delay this whole trial.

"[DEFENSE COUNSEL]: Well, Your Honor, I—I think that's what Dr. Barnett was saying in his second letter. He didn't come out and use those words, but that's what I understand he was trying to convey."

The court then asked defense counsel if Dr. Barnett could appear so they could clarify his opinion. Defense counsel offered to contact him, and suggested that if Dr. Barnett was not able to appear in person because his office is in Lawrence, he might be able to participate in a conference call.

A conference call was arranged and Dr. Barnett was subjected to questioning. He was not placed under oath, but there was no request that his testimony be sworn, nor any objection to proceeding in this fashion. Defense counsel began the inquiry by asking Dr. Barnett, "[B]ased on your evaluations and your interviews in this case, do you have an opinion as to whether or not Mr. Pen-

nington had the mental capacity to form the intent to commit these crimes in February of 2002?" Dr. Barnett responded by stating he needed to answer it with some detail, and then stated:

"Mr. Pennington has a serious delusional disorder. He does not—He does not form intent in the same way that you or I would. He forms intent based on his delusional systems. It's my impression that once he forms this intent he has a great deal of difficulty being derailed from the intent, as evidenced by the recent episodes where he led the police on the wild-goose chases regarding the alleged murder victims. He is below-average intelligence, but he is not mentally retarded. Does that answer your question?"

Defense counsel tried again, asking, "[D]id [Pennington] have the mental capacity to form the intent—criminal intent to commit these crimes in February? And that's again a 'yes' or 'no' answer, as best you can." Dr. Barnett responded, "Yes, but with the caveat that he does not form intent the same way that other people do." Defense counsel asked him to explain, and Dr. Barnett stated:

"In these particular cases the intent was formed based on delusional thinking. Delusions are, simply stated, false beliefs, and in Mr. Pennington's case he does have a delusional disorder. He—False beliefs are generated. He makes decisions and then forms intent based on those and then finds it very—Well, he then has difficulty separating reality from his delusions."

Defense counsel asked Dr. Barnett if he was saying that "he did certain acts, but he did those acts with a mental state which you've defined as a delusional mental state?" Dr. Barnett agreed.

The prosecutor was then given an opportunity to question Dr. Barnett. The prosecutor asked Dr. Barnett to identify specifically what delusion Pennington was operating under at the time of these crimes. Dr. Barnett was unable to do so. Dr. Barnett did admit that the facts demonstrated that Pennington's actions were for the purpose of obtaining money, he had the intent to commit the acts, and they were intentional acts.

The trial court then asked Dr. Barnett about his opinion:

"THE COURT: First of all, I do want to explain the statutes here in Kansas. When a defendant is charged with a crime, whether or not he has a mental disease or defect is not a defense unless the defendant lacked the mental state required as an element of the offense charged, and in this case what we're talking about is intent.

"Now, you know what the defendant is charged with for the crimes back in February, and you've read the reports associated with those crimes. I just have one question to ask you, and I do have to limit you to a 'yes' or 'no' answer.

"DR. BARNETT: I understand.

"THE COURT: Was the defendant able to form the intent necessary to commit the crimes he is charged with?

"DR. BARNETT: Yes.

"THE COURT: Thank you.

"DR. BARNETT: May I ask a question?

"THE COURT: No, but I'll let the—since I asked the question here I'm gonna give the attorneys one more chance at asking you something if they have a question."

Defense counsel then asked Dr. Barnett about different forms of intent. Dr. Barnett said:

"First of all, we—in psychology we assume that virtually all behavior is based on intent. We distinguish between different types of intent. There's intent based on mental reasoning and judgment, which I don't believe Mr. Pennington possesses for a variety of reasons. I've always had difficulty with this statute for that reason in that it's difficult for me to imagine any type of behavior that was not preceded by intent of some kind. So I would have to—my answer to the judge's question would have to be qualified by that statement."

The court granted the motion in limine, ruling that Pennington would not be allowed to call Dr. Barnett as a witness to support his mental disease or defect defense. The court held that under K.S.A. 22-3220, evidence of mental disease or defect is only relevant to the extent it establishes that the defendant lacked the ability to form the necessary criminal intent. Because Dr. Barnett's opinion was that Pennington had the ability to form the criminal intent required to commit the crimes charged, his testimony was irrelevant to the mental disease or defect defense. The court also held that the testimony would "only fill the jury with a lot of extraneous testimony that is not really relevant to the narrow issue that we have."

## THE COURT OF APPEALS OPINION

On appeal to the Court of Appeals, Pennington argued that the exclusion of Dr. Barnett's testimony invaded the province of the jury to weigh Dr. Barnett's testimony and denied him the right to present his defense theory. Two judges on the panel held the trial

court did not abuse its discretion in excluding the testimony. The majority held that in order for evidence of the defendant's delusions and mental problems to be relevant under K.S.A. 22-3220, that evidence must tend to demonstrate that his mental condition prevented him from forming the requisite intent to commit the crimes charged. Because Dr. Barnett's opinion was that Pennington was able to form intent, his testimony was not relevant. *Pennington,* slip op. at 13-14.

The dissenting panel judge contended that K.S.A. 22-3220 should be construed to permit the defense to present testimony on the defendant's mental state, thereby allowing the jury to determine whether the defendant lacked the required mental state under K.S.A. 22-3220.

## ANALYSIS

*Standard of Review*

Generally, we review a trial court's admission or exclusion of expert testimony for abuse of discretion. See, *e.g., State v. Rice,* 261 Kan. 567, 589, 932 P.2d 981 (1997) (quoting *State v. Cheeks,* 253 Kan. 93, 99, 853 P.2d 655 [1993]). However, under *State v. White,* 279 Kan. 326, 331-32, 109 P.3d 1199 (2005), the applicable standard of review in this case is de novo.

As in *White,* the issue involves interpretation of the mental disease or defect defense statute, K.S.A. 22-3220. See *White,* 279 Kan. at 332. This issue also requires the court to determine whether the district court's exercise of discretion was based on an erroneous legal conclusion. The trial court essentially determined that Dr. Barnett's testimony, *as a matter of law,* was not relevant to a defense under the mental disease or defect statute. See *State v. Elnicki,* 279 Kan. 47, 51, 105 P.3d 1222 (2005) (quoting *State v. Carter,* 278 Kan. 74, Syl. ¶ 1, 91 P.3d 1162 (2004) ("evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question"); *cf., State v. Alexander,* 24 Kan. App. 2d 817, 819, 953 P.2d 685 (1998) ("The exclusion of evidence to support a compulsion defense is not subject to the normal abuse of discretion standard for reviewing a trial

court's evidentiary rulings. Whether the compulsion defense is available to a defendant is a matter of law determined by the court."). Lastly, Pennington's claim that he was denied the constitutional right to present his defense theory presents a question of law. See *White*, 279 Kan. at 332-33.

*Discussion*

The mental disease or defect defense is set out in K.S.A. 22-3220, which provides, in pertinent part:

"It is a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged. Mental disease or defect is not otherwise a defense."

We recently summarized the history of K.S.A. 22-3220 in *White*:

"As this court has often explained, prior to the effective date of this statute—January 1, 1996—there were two defenses relating to mental disease or defect: insanity and diminished capacity. See *State v. Hedges*, 269 Kan. 895, 900, 8 P.3d 1259 (2000). Criminal insanity was evaluated using the *M'Naghten* test. 269 Kan. at 900. While the defense of diminished capacity was not a substitute for a plea of insanity, it could be used for the limited purpose of negating specific intent where a defendant was sane. 269 Kan. at 901. However, K.S.A. 22-3220 removed any reference to insanity and instead focused on a lack of the mental state required as an element of the offense charged. It now prevents a defendant from raising insanity or diminished capacity as a defense. See *State v. Jorrick*, 269 Kan. 72, 81, 4 P.3d 610 (2000). Accordingly, all capacity defenses, for crimes which took place on or after January 1, 1996, focus on the *mens rea* of the crime. 269 Kan. at 83." 279 Kan. at 333.

In this case, intent was the only mental state element of the crimes charged. Aggravated robbery requires an intent to take property. Attempted aggravated kidnapping requires intent to commit the crime of aggravated kidnapping. Aggravated kidnapping requires the intent to facilitate flight or the commission of any crime. Thus, in order for evidence of Pennington's mental disease or defect to be a defense under K.S.A. 22-3220, it must have prevented him from forming that intent.

Dr. Barnett, however, was of the opinion that Pennington was capable of forming intent to commit the crimes charged, although he believed he formed that intent based on unspecified delusions. Pennington argues that where an intent to act is formed on the

basis of false beliefs or delusions, the formation of that intent is not rational or purposeful but, rather, is mistaken or accidental. Thus, defendant contends, the evidence of Pennington's delusions was relevant to the question of whether he was capable of forming intent and should have been admitted.

The problem with this argument is that under the *mens rea* approach, it is no longer relevant whether intent is formed rationally or whether it is formed based on delusions. As the Court of Appeals' majority correctly recognized, intent formed on the basis of delusions may have provided a defense under the prior insanity approach, but not under the *mens rea* approach. *Pennington,* slip op. at 13.

The dissenting panel member contended that K.S.A. 22-3220 does not restrict the mental disease or defect defense to the inability to form intent, "even though the offense charged may utilize language of intent." Rather, K.S.A. 22-3220 must be construed more broadly to allow evidence that relates more generally to a defendant's lack of "mental state." *Pennington,* slip op. at D-2.

This argument fails to recognize the distinction between the insanity defense and the more limited *mens rea* defense. Under the insanity defense, evidence of mental state was relevant and admissible even though it did not negate any particular element of the crime. See Rosen, *Insanity Denied: Abolition of the Insanity Defense in Kansas,* 8 Kan. J.L. & Pub. Pol'y 253, 260 (Winter 1999). The *mens rea* defense, on the other hand, only allows evidence of a mental disease or defect that negates the mental state element of the crime charged. See *State v. White,* 279 Kan. at 333-34. As explained by Rosen:

" '[The *mens rea*] approach permits a defendant to introduce expert psychiatric witnesses or evidence to litigate the intent elements of a crime. If the evidence negates the requisite intent, the defendant is entitled to an acquittal. However, there is one major limitation on the defendant's ability to introduce evidence corroborating or showing the existence of a mental disease or defect. Such evidence is only admissible as it specifically relates to the requisite *mens rea* of the offense. *Therefore, the defense cannot introduce evidence as to the existence of a mental disease or defect to litigate the defendant's mental condition in general.* The evidence must relate specifically to the defendant's ability to possess the

requisite *mens rea* of the offense.' " (Emphasis added.) *State v. Jorrick*, 269 Kan. 72, 82, 4 P.3d 610 (2000) (quoting Rosen, 8 Kan. J.L. & Pub. Pol'y at 254-55).

As the panel majority in this case noted, two unpublished Court of Appeals cases support the district court's ruling: *State v. Monreal*, No. 89,304, filed December 24, 2003, *rev. denied* March 30, 2004, and *State v. Jones*, No. 84,149, filed December 22, 2000, *rev. denied* March 20, 2001.

In *Monreal*, a court-ordered competency evaluation resulted in a report that stated the defendant was suffering from "severe major depressive disorder with psychotic symptoms" including auditory and visual hallucinations. *Monreal*, slip op. at 6, 8. The report stated that the defendant had been suffering from that condition for 2 years. The report, however, concluded that the defendant was competent to stand trial.

Based on this report, the defendant filed a motion to raise a mental disease or defect defense. The district court granted the State's motion in limine and prohibited the defendant from introducing expert testimony or mental health evaluations regarding the defendant's mental state at the time of the crime. On appeal, the panel affirmed, holding:

"Although the report supports an inference that the defendant was possibly suffering from depression accompanied by hallucinations at the time of the offense, the report indicated that such hallucinations continued at the time of the competency evaluation and the depression and hallucinations did not affect the defendant's ability to comprehend the gravity of the situation and respond appropriately.

"Relevant evidence is evidence 'having any tendency in reason to prove any material fact.' K.S.A. 60-401(b). In order to be relevant, the evidence regarding the defendant's depression and hallucinations must tend to demonstrate that the defendant's mental condition prevented her from forming the intent to kill her baby. See K.S.A. 22-3220. The Area Mental Health Center report does not support such a conclusion. Even if the defendant suffered from auditory and visual hallucinations which commanded her to kill the child at the time of the offense, the report indicated that the defendant still was capable of forming the intent to kill and of understanding the consequences of her actions. Thus, evidence that the defendant was suffering from a depressive condition is not relevant to a determination of whether the defendant committed intentional second-degree murder." *Monreal*, slip op. at 9.

In *Jones*, the defense psychologist, Dr. Logan testified at a pretrial hearing that the defendant was suffering from posttraumatic stress disorder on the date of the crimes. However, Dr. Logan testified that the defendant's posttraumatic stress disorder did not directly affect the defendant's ability to form a specific intent to kill. The trial court excluded the testimony, ruling that the posttraumatic stress disorder evidence was irrelevant because the doctor had testified it had no effect on the defendant's crimes. Slip op. at 3.

The Court of Appeals affirmed, holding that because the doctor concluded that the defendant's mental disease or defect did not affect his ability to form an intent to kill or have premeditation, the testimony was irrelevant, and the trial court did not abuse its discretion in excluding it. Slip op. at 5.

In a notice of supplemental authority, Pennington asserts that *White* supports his claim that excluding Dr. Barnett's testimony constitutes reversible error. We disagree.

In *White*, the district court prohibited the defense expert's testimony because the expert refused to express an opinion on the ultimate question of whether the defendant lacked the capacity to form the requisite intent because of his mental disease or defect. *White*, 279 Kan. at 335-37. On appeal, this court held that as long as the appropriate standard is met, the expert opinion need not be expressed in "magic words." *White*, 279 Kan. at 341. Because the expert would have testified that the defendant had a mental disease or defect, that people with that disease or defect can lack the ability to premeditate and form intent, and that the defendant's conduct on the date of the shooting was consistent with somebody acting under that disease or defect, the standard was met and it was error to exclude the testimony. *White*, 279 Kan. at 341.

*White* is distinguishable. Unlike the expert in *White*, Dr. Barnett did have an opinion on the ultimate question. More importantly, although the expert in *White* would not use the "magic words," the evidence met the standard for the mental disease or defect defense because the expert would have testified that the defendant was suffering from a mental disease or defect that can cause people to lack the capacity to form intent. In contrast, Dr. Barnett's testi-

mony did not meet the standard because he specifically concluded that Pennington was capable of forming intent.

In summary, we agree with the district court and the panel majority that, because Dr. Barnett's testimony regarding Pennington's mental condition did not tend to demonstrate that he was unable to form the requisite intent to commit the crimes charged, the testimony did not, as a matter of law, support the mental disease or defect defense and was therefore irrelevant. Dr. Barnett's testimony regarding Pennington's mental condition was not admissible to litigate his mental state in general.

The dissent contends our holding is flawed in that it fails to take into account the varying mental states involved in the crimes charged. The dissent suggests that the admissibility of *mens rea* evidence should vary depending on the type of mental state at issue. Under this floating standard, evidence supporting a mental disease or defect defense may be more or less admissible depending on whether the crime charged requires general intent or specific intent, and may even vary depending on the type of specific intent required. Indeed, under this floating standard, admissibility could vary as to the different crimes with which the defendant was charged.

In response, we note that the enactment of the *mens rea* defense eliminated the confusion inherent in applying one standard for a mental disorder defense (insanity) and another which applied only to specific intent crimes (diminished capacity). As Professor Spring explained in his article, *Farewell to Insanity: A Return to Mens Rea*:

"By focusing on *mens rea* jury confusion should be eliminated or at least reduced substantially. . . . [Jurors] will . . . no longer be treated to one definition of the mental state required for the crime, another with respect to insanity, and perhaps a third with respect to diminished capacity and its limited application to issues of special intent. Like insanity, diminished capacity disappears as a separate defense. *Mens rea* simply carries diminished capacity to the logical extreme. With the separate definition of insanity gone, there is no barrier to accepting the idea that if one's capacity can be so diminished by mental disorder as to destroy the capacity to form a special intent, then it may in some circumstances be so diminished as to destroy capacity to form any criminal intent at all. That has always been an illogical limitation, thought necessary only to avoid overlap of insanity

and diminished capacity." Raymond L. Spring, *Farewell to Insanity: A Return to Mens Rea*, 66 J.K.B.A. 38, 45 (May 1997).

The dissent also suggests that Dr. Barnett's testimony was admissible as long as it "could have some bearing on the jury's decision about whether [the *mens rea*] element was satisfied," and that the trial court, in excluding the evidence, inappropriately usurped the jury's role of weighing that evidence.

In making a preliminary determination whether Dr. Barnett's testimony supported the mental disease or defect defense, the trial court was required to evaluate the testimony in light of the confines of that defense. In doing so, the trial court did not usurp the jury's function of weighing the evidence. The trial judge has the power, under K.S.A. 60-456(b), to control expert opinion evidence that would mislead a jury or confuse the question for resolution. *State v. Patton*, 280 Kan. 146, 177, 120 P.3d 760 (2005) (quoting *Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, 461, 14 P.3d 1170 [2000]). Further, although psychological expert opinions are "particularly useful and oftentimes necessary to interpret for the jury the manifestations of mental derangement and the significance of symptoms,' " *State v. Papen*, 274 Kan. 149, 158, 50 P.3d 37 (2002) (quoting *State v. Hobson*, 234 Kan. 133, 160, 671 P.2d 1365 [1983]), to be admissible, expert testimony must be helpful to the jury. *State v. Lumbrera*, 257 Kan. 144, 157, 891 P.2d 1096 (1995).

We agree with the district court that Dr. Barnett's testimony would not have been helpful to the jury, and in fact, had it been admitted, the jury could have been misled into applying the mental disease or defect defense to a situation specifically excluded by the statute.

Pennington also argues that excluding Dr. Barnett's testimony denied him his constitutional right to present his defense theory. Under our state and federal Constitutions, a criminal defendant has the right to present his or her defense theory. *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003). The defendant's fundamental right to a fair trial is violated if relevant, admissible, and noncumulative evidence which is an integral part of the theory of the defense is excluded. *State v. Mays*, 254 Kan. 479, 487, 866 P.2d 1037 (1994).

However, the right to present a defense is subject to statutory rules and case law interpretation of the rules of evidence and procedure. *Patton*, 280 Kan. at 156. K.S.A. 22-3220 is a legislative limitation on what the jury can consider by way of mental disease or defect as a defense to criminal acts. See *State v. Bethel*, 275 Kan. 456, 472-73, 66 P.3d 840 (2003) (upholding constitutionality of 22-3220 and noting the statute significantly narrows the range of what the jury may consider with regard to mental illness as a defense). Although the evidence Pennington sought to present through Dr. Barnett's testimony would have provided a defense under the former insanity defense standard, there is no constitutional right to present evidence relevant only to a defense that has been eliminated by the legislature.

Lastly, while we find no error in the refusal to admit Dr. Barnett's testimony, we will address the dissent's conclusion that the exclusion constitutes reversible error. Dr. Barnett was unable to identify any delusion Pennington was under at the time of the crimes, and Pennington himself did not testify to any delusional mental state. Moreover, Pennington's testimony at trial was consistent with his statements to police concerning his criminal intent in all three incidents.

Pennington testified that his intent in pulling out a knife and demanding money from the clerk at the Total station was to get money. He admitted that when he went into the laundromat, he intended to use a knife to take money from Janet Robinson. He admitted grabbing her, but denied that he cut her with the knife intentionally—claiming it happened as part of the unintended struggle. With respect to the Wal-Mart incident, Pennington admitted that he pretended his truck wouldn't start and asked Stacey Ellis for a ride because he intended to get money or property from her, although his intent "was to get it there—there and then, but it didn't happen like that." He admitted he told Ellis to drive out to a remote area, and that once there, he grabbed her, pulled out a knife, and told her to keep going. When asked if that was an intentional decision, he said, "It happened, but something inside made it happen." He admitted that it was still his intent at that time to get money. He testified he put her into the trunk inten-

tionally, and did so in part because he was scared and because she might attract attention.

Pennington's testimony clearly established that in all three incidents, his purpose was to take money from the victims, and that his actions during those crimes were intended to facilitate that goal. Thus, his own testimony proved he was fully capable of, and did indeed, form the criminal intent necessary as an element of the crimes charged.

Further, Pennington was able to present a mental disease or defect defense. At trial, the defense presented Debra Hastings, a master's level psychologist who had been one of Pennington's treating therapists. Hastings testified that Pennington suffered from borderline personality disorder, which can cause one with that disorder to suffer dissociative or "fugue" states that can last from a few minutes to a few days, during which the individual will "alter from reality." Hastings testified that when she last saw Pennington in January 2002, he was very capable of entering this dissociative state. On cross-examination, however, Hastings agreed that a person in a dissociative state would not be able to remember what occurred once they came out of that state. Hastings was provided the facts of the three incidents and Pennington's confessions, and was asked whether, under those facts, such a person would have been in a fugue state at the time of the crimes. She responded that such a person would not have been in a fugue state.

Pennington also presented evidence of his statements to police about killing other women and burying their bodies, his statements to police claiming responsibility for the Chandra Levy disappearance and murder, his history of making threats through the mail, his conviction for threatening President Reagan, his counseling, his troubled relationship with his mother, the fact that he used to hit himself in the head repeatedly, and the fact that he had been sent to Osawatomie State Hospital in 1985.

Under these circumstances, we agree with the trial court that the admission of Dr. Barnett's testimony would not have made any difference in the outcome of the trial.

The judgment of the Court of Appeals affirming the district court is affirmed. The judgment of the district court is affirmed.

LOCKETT, J., Retired, assigned.

BEIER, J., dissenting: I respectfully dissent. The majority opinion relies upon an overinterpretation of K.S.A. 22-3220 and, as a result, approves exclusion of relevant evidence that should have been admitted to support Pennington's defense of mental disease or defect.

K.S.A. 22-3220 states that "[i]t is a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged. Mental disease or defect is not otherwise a defense."

All Kansas criminal offenses require proof of a *mens rea* element. See K.S.A. 21-3201(a). For each crime, this element is set forth in the defining statute, or it is supplied by K.S.A. 21-3201, or both. See *State v. Bruce*, 255 Kan. 388, 394, 874 P.2d 1165 (1994); *State v. Sterling*, 235 Kan. 526, Syl. ¶ 1, 680 P.2d 301 (1984). In this case, Pennington was convicted of aggravated kidnapping, attempted aggravated kidnapping, and two counts of aggravated robbery. Aggravated kidnapping and attempted aggravated kidnapping are specific intent crimes. See *State v. Esher*, 22 Kan. App. 2d 779, 782-83, 922 P.2d 1123, *rev. denied* 260 Kan. 997 (1996) (listing specific intent crimes). Aggravated robbery is a general intent crime. See *Esher*, 22 Kan. App. 2d at 784 (listing general intent crimes).

Aggravated kidnapping is defined as a kidnapping in which bodily harm is inflicted on the victim. See K.S.A. 21-3421. The kidnapping statute sets forth the specific intent element, requiring proof of a taking or holding of a victim accomplished by force, threat, or deception "with the intent . . . to," among other things, "facilitate . . . commission of any crime." K.S.A. 21-3420. In other words, to get a conviction on this count, the prosecution had to prove Pennington specifically intended to commit a robbery or some other crime when he took and held Ellis. The State had direct

evidence to support this element of the crime. After his arrest, Pennington told officers that he had engaged in all of the three incidents to obtain money.

An attempt is "any overt act toward the perpetration of a crime done by a person *who intends to commit such crime* but fails in the perpetration thereof or is prevented or intercepted in executing such crime." (Emphasis added.) K.S.A. 21-3301(a). Thus, on this count of Pennington's complaint, the prosecution needed to prove that he specifically intended to commit an aggravated kidnapping of Robinson, which in turn required that his taking or holding of her, had it been successful, was specifically intended to facilitate a robbery or other crime.

Aggravated robbery is defined as a robbery committed by a person armed with a dangerous weapon or who inflicts bodily harm. See K.S.A. 21-3427. In the incident at the Total gas station, Pennington was armed with a dangerous weapon. In the incident involving Ellis, he was again armed with a knife and he inflicted bodily harm. Robbery is defined as a taking of property from the person or presence of another by force or by threat of bodily harm. See K.S.A. 21-3426. Because the definitional statutes for aggravated robbery and robbery are silent on the *mens rea* element, the crime of aggravated robbery requires proof only of general intent, as it is described in K.S.A. 21-3201(a) and (b):

"(a) Except as otherwise provided, a criminal intent is an essential element of every crime defined by this code. Criminal intent may be established by proof that the conduct of the accused person was intentional or reckless. Proof of intentional conduct shall be required to establish criminal intent, unless the statute defining the crime expressly provides that the prohibited act is criminal if done in a reckless manner.

"(b) Intentional conduct is conduct that is purposeful and willful and not accidental. As used in this code, the terms 'knowing,' 'willful,' 'purposeful,' and 'on purpose' are included within the term 'intentional.' "

In other words, on the aggravated robbery counts, the State's burden of proof was lighter. It needed to show only that Pennington engaged in "purposeful and willful and not accidental" conduct, not that he had any particular intention about what he would achieve through that conduct.

By enacting K.S.A. 22-3220 in 1995, the legislature did away with Kansas' insanity defense and limited a criminal defendant's opportunity to present evidence that mental illness played a role in his or her crime to that relevant to *mens rea*. See *State v. White*, 279 Kan. 326, 333, 109 P.3d 1199 (2005). A criminal defendant is permitted to introduce expert witnesses or other evidence to litigate that element. If all of the evidence introduced by both sides on that element negates the required *mens rea*, the defendant is entitled to an acquittal.

The majority is correct that evidence of the mere *existence* of a mental disease or defect of the defendant is not relevant and thus not admissible. To be admissible, the evidence of the mental disease or defect must have some bearing on the defendant's ability to form the required *mens rea*. *State v. Jorrick*, 269 Kan. 72, 82, 4 P.3d 610 (2000) (quoting Rosen, *Insanity Denied: Abolition of the Insanity Defense in Kansas*, 8 Kan. J.L. & Pub. Pol'y 253, 254-55 (Winter 1999).

The majority is incorrect, however, in further narrowing the K.S.A. 22-3220 admissibility rule. Its opinion states: "The *mens rea* defense . . . only allows evidence of a mental disease or defect that *negates* the mental state element of the crime charged." (Emphasis added.) Slip op. at 15. The legislature did not demand that a defendant's evidence *negate* the *mens rea* element of the crime charged before it can be admitted. It required only that it be *relevant to* the *mens rea* element before it can be admitted. Indeed, negation of the *mens rea* element entitles a defendant to far more than admission; it entitles him or her to acquittal. See *Jorrick*, 269 Kan. at 82. Whether such negation is achieved is a jury call, to be made once all relevant evidence has been allowed to come before it.

In this case, defense expert Barnett was prepared to testify that Pennington suffered from "a serious delusional disorder. He does not—He does not form intent in the same way that you or I would. He forms intent based on his delusional systems" and, in the charged incidents, "[Pennington's] intent was formed based on delusional thinking."

The majority, like the district court judge, oversimplifies Barnett's opinion. It was not limited to finding "Pennington was able to form intent." Slip op. at 19. According to Barnett, Pennington's ability to form the required *mens rea* was affected and impaired by delusions, erroneous beliefs held in the face of incontrovertible facts to the contrary. Although the results of Pennington's mental disease or defect may have been labeled "intent," when the district judge forced Barnett to reduce his nuanced testimony to one word, the rest of what Barnett had to say made clear that any *mens rea* formed by Pennington was necessarily a function of his trouble recognizing and responding appropriately to reality. This expert opinion testimony was certainly relevant to whether Pennington's mental disease or defect affected his ability to form the required *mens rea* for the crimes charged and should have been admitted pursuant to K.S.A. 22-3220.

In my view, the fact that there was evidence to the contrary is insignificant. Again, the defense did not have to demonstrate that Barnett's testimony would *negate* the *mens rea* element, only that it could have some bearing on the jury's decision about whether that element was satisfied. The statute does not assign a weighing function to the district judge or even to this court, only the determination of relevance and, thus, admissibility.

I find one additional flaw in the reasoning of the district judge and the majority: Both fail to take into account the varying *mens rea* elements at issue in aggravated kidnapping, attempted aggravated kidnapping, and aggravated robbery. The content differences in this element from one crime to another must be considered. A general intent crime such as aggravated robbery is at least arguably less vulnerable to admissibility of evidence supporting a mental disease or defect defense than a specific intent crime such as aggravated kidnapping. Further, all specific intent crimes are not created equal in this regard.

Finally, I would hold that the district judge's error in excluding Barnett's testimony is reversible. There was no real question that Pennington engaged in the conduct that formed the basis of the charges against him. The only issue worth trying was whether he possessed the requisite *mens rea*. When he was prevented from

introducing Barnett's testimony, the members of the jury were deprived of the only evidence that could have prompted them to acquit. Barnett's explanation of Pennington's serious delusional disorder could have made a difference in the outcome, and its absence from the trial was inconsistent with substantial justice.